On certified questions from the United States Court of Appeals for the Federal Circuit; certification order dated July 16, 2008; certification accepted January 29, argued and submitted May 13, 2009; certified questions answered March 11, 2010

KLAMATH IRRIGATION DISTRICT,
Tulelake Irrigation District,
Klamath Drainage District,
Poe Valley Improvement District,
Sunnyside Irrigation District,
Klamath Basin Improvement District,
Klamath Hills District Improvement Co.,
Midland District Improvement Co.,
Malin Irrigation District,
Enterprise Irrigation District,
Pine Grove Irrigation District,
Westside Improvement District No. 4,
Shasta View Irrigation District,
Van Brimmer Ditch Co.,
Fred A. Robison, Albert J. Robison,
Lonny E. Baley, Mark R. Trotman,
Baley Trotman Farms,
James L. Moore, Cheryl L. Moore,
Daniel G. Chin, Deloris D. Chin,
Wong Potatoes, Inc.,
Michael J. Byrne, Daniel W. Byrne,
and Byrne Brothers,
*Plaintiffs,*

*v.*

UNITED STATES OF AMERICA
and Pacific Coast Federation of Fishermen's Associations,
*Defendants,*

*and*

STATE OF OREGON,
by and through the
Oregon Water Resources Department,
*Intervenor.*

(Federal CC No. 2007-5115; SC S056275)

227 P3d 1145

William M. Ganong, Klamath Falls, argued the cause for plaintiffs Klamath Irrigation District, Tulelake Irrigation-District, Klamath Drainage District, Poe Valley Improvement District, Sunnyside Irrigation District, Klamath Basin Improvement District, Klamath Hills District Improvement Co., Midland District Improvement Co., Malin Irrigation District, Enterprise Irrigation District, Pine Grove Irrigation District, Westside Improvement District No. 4, Shasta View Irrigation District, Van Brimmer Ditch Co., Fred A. Robison, Albert J. Robison, Lonny E. Baley, Mark R. Trotman, Baley Trotman Farms, James L. Moore, Cheryl L. Moore, Daniel G. Chin, Deloris D. Chin, Wong Potatoes, Inc., Michael J. Byrne, Daniel W. Byrne, and Byrne Brothers. Michael H. Simon, of Perkins Coie, Portland, filed the briefs for plaintiffs. With him on the briefs were Julia E. Markley, Nicholle Y. Winters, Nancie G. Marzulla, Roger J. Marzulla, and Paul S. Simmons.

David C. Shilton, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C., filed the briefs and argued the cause for defendant United States of America. With him on the briefs were John C. Cruden, Acting Assistant Attorney General, Katherine J. Barton, and Suzanne Bratis, Assistant United States Attorneys.

Todd D. True, Earthjustice, Seattle, Washington, argued the cause and filed the briefs for defendant Pacific Coast Federation of Fishermen's Associations. With him on the briefs was Stephanie M. Parent.

Stephanie L. Striffler, Senior Assistant Attorney General, Salem, argued the cause and filed the briefs for intervenor. With her on the briefs were John R. Kroger, Attorney General, and Jerome Lidz, Solictor General.

Carl Ullman, Klamath Water Project, Chiloquin, filed the brief for *amicus curiae* Klamath Tribes.

John T. Bagg, Salem, filed the brief for *amicus curiae* Natural Resources Defense Council. With him on the brief was John D. Escheverria.

KISTLER, J.

Walters, J., concurred and filed an opinion, in which Balmer and Linder, JJ., joined.

18-b

**KISTLER, J.**

The United States Court of Appeals for the Federal Circuit certified three questions to this court, which this court accepted. *Klamath Irrigation District v. United States*, 345 Or 638, 202 P3d 159 (2009). All three questions arise out of a dispute over water rights in the Klamath River basin. Essentially, they ask whether, as a matter of state law, the farmers and irrigation districts that use water from a federal reclamation project have an equitable property interest in a water right to which the United States holds legal title and whether an equitable property interest in a water right is subject to adjudication in the ongoing Klamath Basin water rights adjudication. In answering those questions, we begin by describing the procedural posture in which the questions arise. We then discuss briefly the common law and statutory context that preceded a 1905 state statute on which the parties' arguments turn. Finally, we answer the certified questions.

I

The Federal Bureau of Reclamation (the Bureau) manages the Klamath Project, which stores and supplies water to farmers, irrigation districts, and federal wildlife refuges in the Klamath River basin. The plaintiffs in the underlying federal litigation are farmers and irrigation districts that use water from the Klamath Project for irrigation and other agricultural purposes. As a result of drought conditions in 2001, the Bureau terminated the delivery of water to plaintiffs that year in order to make water available for three species of endangered fish.[1]

Claiming a property right in the water, plaintiffs brought an action in the United States Court of Federal Claims, alleging that the United States had taken their property in violation of the Fifth Amendment and, alternatively, that the United States had breached its contractual obligation to deliver water to them. The United States asked the federal claims court to abstain from deciding plaintiffs' takings claim until an ongoing state water rights adjudication

---

[1] The Bureau was able to make some water (approximately 70,000 acre feet) available in July 2001.

determined what, if any, property rights plaintiffs had in the water from the Klamath Project. *Cf. Colorado River Water Conservation Dist. v. United States*, 424 US 800, 819-20, 96 S Ct 1236, 47 L Ed 2d 483 (1976) (upholding a federal district court ruling abstaining from deciding federal government and tribal water rights that were at issue in a state water rights adjudication).

In response to that argument, plaintiffs told the federal court that they were not asserting, in federal court, any right to water that the state water rights adjudication would determine. Plaintiffs took the position that the state water rights adjudication would resolve who has the legal title to use the water from the Klamath River basin but that it would not resolve who has an equitable or beneficial property interest in using the water. Plaintiffs accordingly assumed, for the purposes of their federal takings claim, that the United States holds legal title to the water rights, and they elected to proceed in the federal action solely on the theory that they hold an equitable or beneficial interest in the water rights, which the government took when it refused to deliver water to them in 2001. The Court of Federal Claims proceeded on that theory, *see Klamath Irrigation District v. United States*, 67 Fed Cl 504, 513-14 (2005) (describing plaintiffs' position), and so do we in answering the certified questions.[2]

Plaintiffs have argued in the federal action that their equitable property interest in the water arose from two sources: Section 8 of the Reclamation Act of 1902, ch 1093, 32 Stat 388, and state water law. The Court of Federal Claims held that neither source of law gave plaintiffs an equitable interest in the water from the Klamath Project. The court initially reasoned that federal law did not define the scope of plaintiffs' water rights. 67 Fed Cl at 518-23.[3] Turning to

_____

[2] We understand that some or all plaintiffs have asserted in the state water rights adjudication that they hold legal title to the water right and are entitled to have a certificated water right issued to them. In answering the certified questions, we accept plaintiffs' claim as they have narrowed it in the federal proceeding; that is, we assume that the United States holds legal title to the water and that plaintiffs claim only an equitable or beneficial interest in the water. We express no opinion on plaintiffs' claims that they obtained and hold legal title to water from the Klamath Project. We leave that question for the state water rights adjudication.

[3] We do not describe the Court of Federal Claims' reasoning regarding plaintiffs' claims under section 8 of the Reclamation Act. That issue is beyond the scope of the questions that the Federal Circuit has posed.

plaintiffs' state law claims, the court held that, the United States appropriated, pursuant to a 1905 Oregon statute, all the then-unappropriated waters of the Klamath Basin and that, under the terms of the 1905 statute, a person could not obtain any property interest in that water without a formal written release from the United States. *Id.* at 526-27.

At two points in its opinion, the Court of Federal Claims summarized and quoted excerpts of various contracts between the United States and plaintiffs concerning the distribution of water. *Id.* at 510-12, 527-30. The court later explained that plaintiffs' contractual agreements with the United States divided into five basic categories:

> "(i) interests based upon an exchange agreement, in which preexisting water rights were exchanged for an interest in the Project water; (ii) interests deriving from district contracts with the United States or the Bureau, claimed by the districts; (iii) interests deriving from the district contracts with the United States, claimed by individual irrigators as alleged third-party beneficiaries; (iv) interests based upon application for the beneficial use of water filed either by homesteaders on reclaimed lands (Form A), or by homesteaders or other landowners whose property does not involve reclaimed lands (Form B), and the patent deeds issued allegedly in response thereto; and (v) interests based upon alleged water rights permits granted by the State Oregon after the repeal of the 1905 Oregon legislation in 1953."

*Id.* at 530-31. The court concluded that agreements falling into the first three categories resulted in contractual rights to receive water and that a contractual interest is not a property interest that gives rise to a takings claim under the Fifth Amendment.[4] *Id.* at 531-32. Regarding the fourth and fifth categories, the court concluded that, because the patent deeds and the water rights granted by the state had a later priority date than the United States' water right, the United States had not taken those rights when it denied water to plaintiffs. *Id.* at 538-39.

---

[4] It is not completely clear from the Court of Federal Claims' opinion why, in its view, the agreements in the first three categories gave rise only to contractual rights to receive water.

Having reached those conclusions, the Court of Federal Claims granted summary judgment for the United States on plaintiffs' takings claim. *Id.* at 540. Later, in a separate opinion, that court granted summary judgment for the United States on plaintiffs' contractual claim, reasoning that the sovereign acts doctrine provided a complete defense to that claim. *Klamath Irrigation District v. United States*, 75 Fed Cl 677, 695 (2007). Having disposed of both claims, the court entered judgment in the United States' favor.

Plaintiffs appealed to the United States Court of Appeals for the Federal Circuit. Regarding plaintiffs' takings claim, the Federal Circuit observed that the "answer to [plaintiffs'] takings question depends upon complex issues of Oregon property law, including the interpretation of Oregon General Laws, Chapter 228, § 2 (1905)." *Klamath Irrigation Dist. v. United States*, 532 F3d 1376, 1377 (Fed Cir 2008). To assist its resolution of plaintiffs' takings claim, the Federal Circuit certified three state law questions to this court:

"1. Assuming that Klamath Basin water for the Klamath Reclamation Project 'may be deemed to have been appropriated by the United States' pursuant to Oregon General Laws, Chapter 228, § 2 (1905), does that statute preclude irrigation districts and landowners from acquiring a beneficial or equitable property interest in the water right acquired by the United States?

"2. In light of the statute, do the landowners who receive water from the Klamath Basin Reclamation Project and put the water to beneficial use have a beneficial or equitable property interest appurtenant to their land in the water right acquired by the United States, and do the irrigation districts that receive water from the Klamath Basin Reclamation Project have a beneficial or equitable property interest in the water right acquired by the United States?

"3. With respect to surface water rights where appropriation was initiated under Oregon law prior to February 24, 1909, and where such rights are not within any previously adjudicated area of the Klamath Basin, does Oregon State law recognize any property interest, whether legal or equitable, in the use of Klamath Basin water that is not subject to adjudication in the Klamath Basin Adjudication?"

*Id.* at 1377-78. As noted, we accepted the certified questions.

## II

Before answering those questions, it is helpful to discuss briefly the common-law and statutory context for the Oregon legislature's enactment of the 1905 statute. *See Stevens v. Czerniak*, 336 Or 392, 401, 84 P3d 140 (2004) (explaining that the context for interpreting a statute's text includes " 'the preexisting common law and the statutory framework within which the law was enacted' " (quoting *Denton and Denton*, 326 Or 236, 241, 951 P2d 693 (1998)).[5] We begin with the Oregon common law regarding the appropriation of water rights. We then turn to the statutory background that both preceded the 1905 Oregon statute and informs our understanding of it.

Before 1905, the Oregon courts had adopted the doctrine of prior appropriation of water rights. *See Fort Vannoy Irrigation v. Water Resources Comm.*, 345 Or 56, 64-67, 188 P3d 277 (2008) (describing the history of that doctrine in Oregon). To encourage the beneficial use of water, Oregon courts recognized before 1905 that a person who puts surface water to beneficial use acquires a right to use that water that takes precedence over subsequent users. *See id.* (same). Before the Oregon legislature codified the doctrine of prior appropriation in 1909, this court had held that a person seeking to establish his or her right to use water had to prove three elements:

> "First, an intent to apply it to some beneficial use, existing at the time or contemplated in the future; second, a diversion from the natural channel by means of a ditch, canal, or other structure; and third, an application of it, within a reasonable time, to some useful industry."

*Low v. Rizor*, 25 Or 551, 557, 37 P 82 (1894).

Customarily, the intent to apply water to a beneficial use was manifested by some form of public notice, and the date of the appropriation related back to the date of the notice, as long as the appropriator both began the diversion of the water and put the water to beneficial use within a reasonable time. *Nevada Ditch Co. v. Bennett*, 30 Or 59, 84-86, 45 P

---

[5] Because no legislative history of the 1905 act remains, we are left with the text and context of that statute to determine the legislature's intent.

472 (1896); *see Re Rights to Waters of Silvies River*, 115 Or 27, 101-02, 237 P 322 (1925) (describing pre-1909-code methods of providing notice). Put differently, although appropriation was perfected " 'only when the ditches or canals [we]re completed, the water diverted from its natural stream or channel, and actually used for beneficial purposes,' " the priority date for the water right related back to the date of the notice as long as the diversion and beneficial use were accomplished with reasonable diligence. *Nevada Ditch*, 30 Or at 90-91 (quoting Clesson S. Kinney, *A Treatise on the Law of Irrigation and Water Rights* § 167 (1894)).

■ The scope and extent of the appropriation turned on the appropriator's intent, typically manifested in the notice and ultimately limited by the beneficial use to which the water was put. *See id.* at 98-100 (explaining that the extent of the appropriation with a priority date that related back to the notice turned on the use set out in the notice and did not include other or additional uses). The right to use water, once appropriated, is appurtenant to the land and passes with it, even without an express grant of water rights in the deed conveying the land. *Simmons v. Winters*, 21 Or 35, 44, 27 P 7 (1891).

Initially, the court's decisions focused only on individuals who diverted water for use on property that they owned, and the cases frequently turned on factual disputes, such as the diligence with which the owner had constructed a ditch to put the water to beneficial use. The application of those common-law rules raised potentially more difficult legal issues when a person diverted water for use on land that he or she did not yet own and, in a separate situation, when one person diverted water for another's use.

The first situation arose primarily as a result of federal acts, such as the Homestead Act of 1862, ch 79, 12 Stat 392, that promised a tract of federal land to persons who entered onto public land and reclaimed it. Typically, those acts required an initial application, an entry onto the land, and proof that the settler had completed certain requirements within a period of years. *E.g.*, *id.* § 2. Until the settler completed those requirements, legal title to the land remained in the United States.

This court first considered what state property rights, if any, a settler had in such land in *Kitcherside v. Myers*, 10 Or 21 (1881). In that case, the court explained that the disputed land "is public land of the United States, subject to be taken under the acts of congress as homestead, and which the plaintiff has taken the necessary preliminary steps to secure as a homestead." *Id.* at 26. The defendant, however, had occupied part of the plaintiff's tract, and both parties claimed a right to possess the part of the tract that the defendant occupied. *Id.* at 21-22. Recognizing that legal title to the land lay in the United States (the plaintiff had not yet perfected his claim and received a patent from the government), the court held that "[t]he right of possession of the plaintiff for the purpose of homestead is a valuable right which equity will protect." *Id.* at 26-27. Accordingly, it upheld the trial court's decree giving the plaintiff the right of possession. *Id.* at 27.

Later, the court held that, when a settler had put water to beneficial use on such land, the water right was appurtenant to the land and passed with it even though the settler had not yet received legal title to the land. *Hindman v. Rizor*, 21 Or 112, 117-18, 27 P 13 (1891). In *Hindman*, the plaintiff's predecessors in interest entered onto federal land in 1863, diverted water onto the land, and cultivated it, but did not perfect their title to the land until 1882. *Id.* at 115. The question in *Hindman* was whether the plaintiff's predecessors in interest had obtained a water right before 1882 (the date that they perfected their title to the land) that they could pass to the plaintiff.[6]

In answering that question, this court recognized initially that "[a] settler upon public land has a [possessory] right thereto as against every person except the government, and when such settlement is made with the view of obtaining title, such right is a valuable property right, which the courts will protect and enforce." *Id.* at 116-17 (citing *Kitcherside*).

---

[6] The question arose because, after 1863 but before 1882, another person had put water to beneficial use on land that he owned and claimed that his appropriation was prior to the plaintiff's, whose water rights he contended did not vest until plaintiff's predecessor in interest perfected title to the land in 1882.

The court also recognized that, "[w]hen such a settler appropriates water for the necessary irrigation of the land occupied by him, it becomes as much a part of his improvements as his buildings or fences, and can be sold and transferred with his possessory right in the same way." *Id.* at 117. The court explained that "[t]he water when appropriated and used for irrigation becomes an incident to the land, and the transfer of the possessory rights thereto carries with it the water unless expressly reserved." *Id.* at 118. Accordingly, the court held that the plaintiff's predecessors in interest had obtained a water right before they obtained title to the property in 1882, which could and did pass to the plaintiff.

The Oregon courts also considered, for the first time in *Nevada Ditch*, whether one person could appropriate water for another's use and, if that were possible, what rights the user had in the water. The court explained that, in many instances, individual landowners located at some distance from streams lacked the resources, even when they acted collectively, to construct ditches to divert water to irrigate their lands. *Id.* at 96. It observed that, "[i]n such cases other persons possessing capital are often willing to make the diversion for the benefit of those who have use for the water * * *." *Id.* However, that arrangement raised fundamental questions, the foremost of which was whether one person could appropriate water for another's use. And if that were possible, questions arose concerning the relationship between the appropriator and the user, the priority date of the water right, and whether the appropriator, the user, or both owned the right.

The court answered two of those questions in *Nevada Ditch*. It held initially that one person could appropriate water for another's use; that is, "the bona fide intention which is required of the appropriator to apply the water to some useful purpose may comprehend a use to be made by or through another person, and upon lands and possessions other than those of the appropriator." *Id.* at 97. It also held that, under Oregon law, the persons who used water that another person had appropriated had the same priority date (the date of the notice) as long as the later user put the water to beneficial use within a reasonable time and the use came

within the scope of the original plan set out in the appropriator's notice. *Id.* at 98-102.[7]

The court noted but did not decide two aspects of the relationship between the appropriator and the persons who put the water to beneficial use. It noted initially that "it would seem that he who designed the scheme and made the diversion [the appropriator] was the principal, rather than the user, who applies the result of the former's labor to his beneficial purpose." *Id.* at 97-98.[8] Having noted that that "seem[ed]" to be the relationship, the court did not decide whether that was the relationship. Rather, it observed that, "in whatever capacity the parties to the appropriation may be considered," both were necessary to appropriate the water. *Id.* at 98. The court next raised the question of who, as between the appropriator and the user, "would own the appropriation when it is completed." *Id.* The court again found it unnecessary to decide that issue but observed, in *dicta*, that "[w]e are of the opinion * * * that it is the subject of contract between the person who initiates the appropriation and the user." *Id.* at 98. The court went on to note that, in any event, both the appropriator and the user were necessary to perfect and maintain an appropriation. *Id.*

Later Oregon decisions, issued after 1905, have addressed the respective rights of appropriators and users of a water right when one person appropriates water for

---

[7] The court's holding in this regard is expressed in its resolution of the parties' claims. Accordingly, we describe the relevant facts and the court's resolution of the parties' claims briefly. On July 12, 1881, the principals of what became the Nevada Ditch Co. posted a notice of their intent to divert 8,000 miners' inches of water from the Malheur River for agricultural and milling purposes. *Nevada Ditch*, 30 Or at 64-65. The notice set out generally the route and terminals of the ditch. *Id.* at 65. Other settlers came as late as 1886 and took subdivided interests in the ditch according to the original plan. *Id.* at 69. Meanwhile, other persons appropriated water from the Malheur River after 1881 but before the later settlers came in 1886 and began putting the water to beneficial use. Although those persons claimed a prior right to the water than the later settlers claiming under Nevada Ditch's appropriation, this court held that the priority date for the later settlers' water rights related back to the date of the 1881 notice. *Id.* at 102. This court also held that the priority date for subsequent extensions of the ditch, which went beyond the original plan, did not relate back to the 1881 notice but had a separate priority date. *Id.* at 100.

[8] In making that observation, the court distinguished Oregon law from Colorado law, which regarded the person who diverted the water as the agent for the person who put it to beneficial use. *Id.* at 97.

another's use. For instance, this court has explained that, in "a mutual water company, not organized for the purpose of selling water or as a profit corporation, but for the sole purpose of transmitting and delivering to the appropriators and owners of the water the quantity to which each is entitled," the corporation held legal title to the water right and acted as the trustee for the users who have a beneficial property interest in the water right. *Eldredge v. Mill Ditch Co.*, 90 Or 590, 596, 177 P 939 (1919); *see Smith v. Enterprise Irrigation Dist.*, 160 Or 372, 378-79, 85 P2d 1021 (1939) (an irrigation district held the water right in trust for the district's members even though the statute creating that irrigation district did not so provide). Later, the court explained that, when a private for-profit corporation, acting pursuant to an 1891 Oregon statute, entered into annual rental agreements with the persons using the water, the corporation, not the users, owned the water right. *In re Waters of Walla Walla River*, 141 Or 492, 498, 16 P2d 939 (1933).

That was the state of the Oregon common law of appropriation before 1905, with the later gloss placed on it by *Eldredge, Smith*, and *Walla Walla River*. The common law that preexisted the 1905 statute is, however, not the only context for the 1905 statute. Both the state and the federal government passed various statutes before 1905 that inform our understanding of the 1905 Oregon statute. Those statutes share a similar purpose; they were intended, in one way or another, to get water to the arid lands in Oregon (and the west) so that those lands could be settled and reclaimed. However, those acts differ in their details, and that difference potentially has significance in understanding what the Oregon legislature intended in 1905. Accordingly, we briefly summarize the Oregon act of 1891 and the Oregon act of 1895 before turning to the federal legislation and Oregon's response to it.

In 1891, Oregon passed a law giving private companies a franchise to construct ditches and provide water for irrigation and related purposes to persons whose lands were adjacent to or within reach of the ditches. Or Laws 1891, p 52, § 1. For the company's use of the water to come within the terms of the 1891 act, the company had to supply the water to

all persons, adjacent to or within reach of the ditches, "without discrimination other than priority of contract, upon payment of charges therefor, as long as there may be water to supply." *Id.*

The act required the private company to post a notice and, within 10 days, to file a copy of the notice with the county clerk identifying the point at which the head-gate would be constructed, the general course and size of the ditch, the number of cubic inches of water to be appropriated, and the number of reservoirs, if any. *Id.* §§ 4-5. The act also required the company to begin constructing the ditch within six months and to "prosecute the [construction of the ditch] without intermission [except for certain contingencies] until the same be completed." *Id.* § 9. The act did not expressly make the extent of the appropriation turn on the amount of water put to beneficial use. Rather, it provided that "the actual capacity of [the] ditch or canal or flume, when completed, shall determine the extent of the appropriation" and that, upon compliance with the terms of the act, "the right to the use of the water appropriated shall relate back to the date of posting said notice." *Id.* Finally, the act provided that the right to use the water, once appropriated, may be "lost by abandonment" if the corporation constructing the ditch "shall fail or neglect to use the same for the period of one year at any time." *Id.* § 22.

This court did not have occasion before 1905 to interpret the rights arising under that act, at least as they bear on the issues in this case. In 1924, this court read the 1891 act in light of the provisions of the 1909 statute setting out Oregon's water code; it suggested that a beneficial use was necessary to perfect an appropriation of water under the 1891 act and, relying on *dicta* from *Eldredge*, that the persons who used the water were the true owners of the water right. *See Re Water Rights of Hood River*, 114 Or 112, 134-39, 227 P 1065 (1924) (quoting *dicta* from *Eldredge* for the proposition that " 'even in cases of public service corporations organized for profit and selling water to the general public, * * * the water and ditch rights really belong to the individual appropriator' ").

In 1933, this court held that the *dicta* in *Eldredge* did not apply to corporations acting pursuant to the 1891 act.

*Walla Walla River*, 141 Or at 498. The court concluded that, when a public company complies with the provisions of the 1891 act, "it, and not the owner of the land supplied, acquires the right to the use of the water." *Id.* at 497. It explained that " '[t]he water is appurtenant to, but not inseparable from the land,' " *id.* (quoting *In re Waters of Deschutes River*, 134 Or 623, 657, 286 P 563, 294 P 1049 (1930)), and that, when the water users took their water under annual rental contracts, "those rental contracts limited their rights to the extent of water and time designated in the contract," 141 Or at 499.[9]

In 1895, the Oregon legislature took a different approach. It authorized the formation of irrigation districts that would acquire water rights and hold them in trust for their members. Or Laws 1895, p 13; *see Little Walla Walla Irrigation Dist. v. Preston*, 46 Or 5, 78 P 982 (1904) (describing the source and terms of the 1895 act). Specifically, the 1895 act authorized persons owning land susceptible to irrigation to petition for the creation of an irrigation district. *Id.* §§ 1, 2. In addition to providing procedural protections for the members of the district, the act authorized the board of directors of an irrigation district "to acquire, either by purchase or condemnation (or other legal means), all lands and waters and water rights, and other property necessary for the construction, use, supply, maintenance, repair and improvements of said canal or canals and works." *Id.* §§ 3, 12. Further, it provided that "[t]he legal title to all property acquired under the provisions of this act shall * * * vest in such irrigation district, and shall be held in trust for and is hereby dedicated and set apart to the uses and purposes set forth in this act." *Id.* § 13. The terms of the act thus provided that, although the irrigation district would hold legal title to the water that it appropriated, it would hold that title in trust for its members. *Cf. Fort Vannoy*, 345 Or at 85-86 (construing the modern counterpart to the 1895 act).

---

[9] In *Walla Walla River*, one water company that had organized under the 1891 act appropriated water in 1903, which it supplied to water users pursuant to annual rental contracts. 141 Or at 495. Later, those same users began to take water from a second water company. *Id.* at 496. The second company contended that, because the water was appurtenant to the land, the users (and it derivatively) could claim an appropriation date of 1903. As explained above, this court disagreed, holding that the first company, not the users, held the entire water right.

Oregon was not alone in seeking to bring water to the arid west so that the land could be reclaimed and put to beneficial use. The Supreme Court recounted the federal government's efforts in that regard in *California v. United States*, 438 US 645, 656-63, 98 S Ct 2985, 57 L Ed 2d 1018 (1978). It explained that, after Congress passed the Homestead Act of 1862, 12 Stat 392, to open up the public domain generally, Congress "took its first step toward encouraging the reclamation and settlement of the public desert lands in the West" by passing the Desert Land Act of 1877. *California*, 438 US at 657. That act made 640 acres of arid desert lands available to persons who, after filing a declaration and paying 25 cents an acre, reclaimed the land "by conducting water upon the same." Desert Land Act of 1877, ch 107, 19 Stat 377.[10]

The persons who acquired public land pursuant to the Homestead and Desert Land Acts typically "chose those lands which were the nearest or most accessible to the streams," leaving more remote and less accessible lands uncultivated. Clesson S. Kinney, 3 *A Treatise on the Law of Irrigation and Water Rights* § 1314 (2d ed 1912). Congress sought to promote cultivation of those more remote lands by enacting the Carey Act in 1894. Carey Act, ch 301, § 4, 28 Stat 422. That act authorized the Secretary of the Interior to "donate, grant, and patent to [certain] State[s] * * * such desert lands, not exceeding one million acres in each State, as the State may cause to be irrigated, reclaimed, [and] occupied." *Id.* The Carey Act left it to the states either to construct themselves or to secure construction, through agreements with private contractors, of the canals and irrigation works necessary to reclaim the more remote tracts of desert land. Kinney, 3 *A Treatise on the Law of Irrigation and Water Rights* § 1323.[11]

---

[10] The Desert Land Act is notable primarily because it confirmed that

"all non-navigable waters then a part of the [federal] public domain became *publici juris*, subject to the plenary control of the designated states * * * the right in each to determine for itself to what extent the rule of appropriation or the common-law rule in respect of riparian rights should obtain."

*California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 US 142, 163-64, 55 S Ct 725, 79 L Ed 1356 (1935).

[11] To take advantage of the Carey Act, Oregon passed a law in 1901 accepting the conditions that Congress had placed on the grant of desert lands to the states.

Private efforts at creating large-scale reclamation works in the arid West did not prove profitable, and the Carey Act did little to advance the reclamation of those lands that Congress had sought to encourage. *See* 2 *Water and Water Rights*, § 41.02 at 41-7 (3d ed 2009). In his message to Congress on December 3, 1901, President Theodore Roosevelt noted that problem. He told Congress that there "remain * * * vast areas of public land which can be made available for homestead settlement, but only by reservoirs and main-line canals, impracticable for private enterprise." Kinney, 3 *A Treatise on the Law of Irrigation and Water Rights* § 1238 at 2239 (quoting President Theodore Roosevelt, Message to Congress (Dec 3, 1901)). The President proposed that the United States build the large-scale irrigation works necessary for the federal government to achieve its object of "dispos[ing] of the land to settlers who will build homes upon it." *Id.*

Specifically, the President proposed that

"These irrigation works should be built by the Government for actual settlers, and the cost of construction should, so far as possible, be repaid by the land reclaimed. The distribution of the water, the divisions of the streams among irrigators, should be left to the settlers themselves, in conformity with the state laws, and without interference with those laws or with vested rights. The policy of the National Government should be to aid irrigation in the several States and Territories in such a manner as will enable the people in the local communities to help themselves, and as will stimulate needed reforms in the State laws and regulations governing irrigation."

*Id.* Within six months after President Roosevelt's speech to Congress, the Congress passed and the President signed into law the Reclamation Act of 1902. *Id.* at 2238.

---

Or Laws 1901, p 378, § 1. The Oregon legislature authorized the State Land Board to enter into contracts with private companies to construct ditches, if the companies agreed to meet certain conditions. *Id.* §§ 2-5. The act also provided that "[t]he right to the use of water for irrigation of any tract or subdivision of lands reclaimed under the provisions of this act shall become and perpetually remain appurtenant thereto," subject to annual maintenance charges and "proper and reasonable rules and regulations adopted for the irrigation system under and by which the said land has been reclaimed." *Id.* § 8.

The Reclamation Act created a fund derived from the proceeds of the sale of public lands to be used for the construction of "irrigation works for the storage, diversion, and development of waters for the reclamation of arid and semiarid lands in the [western states and territories]." The Reclamation Act of 1902, ch 1093, 32 Stat 388 § 1. It authorized the Secretary of the Interior, upon determining that an irrigation contract was practicable, to let contracts for the construction of irrigation works and to give public notice of the "lands irrigable under such project, [the] limit of area per entry," and "the charges which shall be made per acre upon the said entries, * * * and the number of annual installments, not exceeding ten, in which such charges shall be paid." *Id.* § 4. The Act provided that the charges shall be determined "with a view of returning to the reclamation fund the estimated cost of construction of the project, and shall be apportioned equitably." *Id.*

The Act provided that persons entering onto the land

"shall, in addition to compliance with the homestead laws, reclaim at least one-half of the total irrigable area of his entry for agricultural purposes, and before receiving patent for the lands covered by his entry shall pay to the Government the charges apportioned against such tract as provided [above]."

*Id.* § 5. The Act also provided for the sale of water rights to privately owned land within the reclamation project and stated that "no such right shall permanently attach [to the privately owned land] until all payments therefore be made." *Id.* Finally, the Act provided that "a failure to make any two [annual] payments when due shall render the entry subject to cancellation, with the forfeiture of all rights under this Act." *Id.*

The Act contemplated that, when the "major portion of the lands irrigated from the waters of any works herein provided for" has been paid, then the "management and operation of such irrigation works shall pass to the owners of the lands irrigated thereby." *Id.* § 6. The Act specified, however,

that "title to and the management and operation of the reservoirs and the works necessary for their protection and operation shall remain in the Government until otherwise provided by Congress." *Id.* Finally, the Act reserved state control over water rights with one proviso. *Id.* § 8. Specifically, section 8 of the Act provided:

> "That nothing in this Act shall be construed as affecting or intending to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws * * *: *Provided,* That the right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limitation of the right."

The United States Supreme Court has explained that, in enacting the Reclamation Act, Congress intended that "the Secretary would have to appropriate, purchase, or condemn necessary water rights in strict conformity with state law." *California,* 438 US at 665. The Court also explained that Congress intended that, "once the waters were released from the Dam [or project], their distribution to individual landowners would again be controlled by state law." *Id.* at 667. The Court observed, however, that

> "Congress did not intend to relinquish total control of the actual distribution of the reclamation water to the States. Congress provided in § 8 itself that the water right must be appurtenant to the land irrigated and governed by beneficial use, and in § 5 Congress forbade the sale of reclamation water to tracts of land of more than 160 acres."

*Id.* at 668 n 21.[12]

In response to the Reclamation Act, the 1905 Oregon legislature passed an act that, among other things, created a procedure for the United States to appropriate water for the

---

[12] Since 1902, Congress has amended the Reclamation Act on numerous occasions. We describe the Reclamation Act as originally enacted because Congress had not amended it substantively before the Oregon legislature enacted the 1905 statute that gives rise to the certified questions.

irrigation works that the Reclamation Act authorized. Oregon Laws 1905, chapter 228, section 2, of the 1905 act provided:

> "Whenever the proper officers of the United States, author-ized by law to construct works for the utilization of water within this State, shall file in the office of the State Engineer a written notice that the United States intends to utilize certain specified waters, the waters described in such notice and unappropriated at the time of the filing thereof shall not be subject to further appropriation under the laws of this State, but shall be deemed to have been appropriated by the United States; *provided,* that within a period of three years from the date of filing such notice the proper officer of the United States shall file final plans of the proposed works in the office of the State Engineer for his information; *and provided further,* that within four years from the date of such notice the United States shall authorize the construction of such proposed work. No adverse claims to the use of the water required in connec-tion with such plans shall be acquired under the laws of this State except as for such amount of said waters described in such notice as may be formally released in writing by an officer of the United States thereunto duly authorized, which release shall also be filed in the office of the State Engineer."

The state act also authorized the state engineer to gather the necessary data to determine any prior rights to use water from a stream system on which the United States planned to construct irrigation works; it authorized the Oregon Attorney General to file a suit in state court, on the Secretary of the Interior's request, to determine and declare those rights; and it specified that any decree resulting from such a suit shall "declare, as to the water right adjudged to each party * * * the extent, the priority, amount, purpose, place of use, and, as to water used for irrigation, the specific tracts of land to which it shall be appurtenant." Or Laws 1905, ch 228, §§ 3-5.

On February 28, 1905, a representative of the United States posted a notice claiming "all the unappropri-ated waters of the Klamath River." The notice stated that "[t]he [w]ater is to be used for irrigation, domestic, power, mechanical and other beneficial uses in and upon lands situ-ated in Klamath Oregon and Modoc California counties." On

May 17, 1905, the Bureau filed the following notice with the state engineer:

> "Notice is hereby given that the United States intends to utilize * * * [a]ll of the waters of the Klamath Basin in Oregon * * *.
>
> "It is the intention of the United States to completely utilize all the waters of the Klamath Basin in Oregon, and to this end this notice includes all lakes, springs, streams, marshes and all other available waters lying or flowing therein.
>
> "That the United States intends to use the above described waters in the operation of works for the utilization of water in the State of Oregon under the provisions of the act of Congress approved June 17, 1902 (32 Stat, 388), known as the Reclamation Act."

*Klamath Irrigation Dist.*, 67 Fed Cl at 524 (quoting the notice filed with the state engineer).[13] With that background in mind, we turn to the Federal Circuit's questions.

## III

### A

■    The Federal Circuit's first question asks:

> "Assuming that Klamath Basin water for the Klamath Reclamation Project 'may be deemed to have been appropriated by the United States' pursuant to Oregon General Laws, Chapter 228, § 2 (1905), does that statute preclude irrigation districts and landowners from acquiring a beneficial or equitable property interest in the water right acquired by the United States?"

In answering that question, we assume that the United States appropriated water rights pursuant to the 1905 statute[14] and that it acquired and presently holds legal title to

---

[13] The Court of Federal Claims noted that the United States also posted a notice of appropriation for the Lost River system but did not set out the terms of that notice. 67 Fed Cl at 524.

[14] The parties disagree whether the United States appropriated the water rights solely by complying with the three conditions specified in the 1905 statute or whether the water also had to be put to beneficial use to perfect the appropriation. The court's first question, however, asks us to assume that the United States appropriated the water rights. The mechanism by which it accomplished that appropriation may be important to answer whether, as the state contends, both the

use the water for the purposes stated in its notice. The question that the Federal Circuit has asked is: In providing that the United States could appropriate water rights pursuant to the 1905 statute, did the Oregon legislature intend to preclude persons putting the water to beneficial use from acquiring a beneficial or equitable property interest in the water right? The answer to that question is "no."

The first sentence in section 2 of the 1905 statute provides that, if the United States files a notice and meets two other conditions, all the unappropriated waters described in the notice "shall not be subject to further appropriation under the laws of this State, but shall be deemed to have been appropriated by the United States." Or Laws 1905, ch 228, § 2. The quoted phrase provides two potential grounds for concluding that the legislature intended to preclude plaintiffs from acquiring an equitable right. First, section 2 provides that the water described in the United States' notice is not subject to further appropriation. Plaintiffs, however, are not seeking to appropriate the water right that the United States holds. Rather, they contend in this proceeding only that, because the United States holds the water right in trust for them, they have a derivative interest in that right.

Second, section 2 designates the United States as the "appropriator" of the water right. Potentially, designating the United States as the "appropriator" of a water right could express an intent to preclude others from acquiring an equitable property interest in that right. Because appropriation was a term of art, we look to the way that the Oregon courts and legislature had used that term before 1905 in order to understand the significance of that designation. As noted, this court had held in *Nevada Ditch* that one person may appropriate water for another's use and that a later user who puts the water to beneficial use within a reasonable period of time pursuant to the appropriator's original plan takes the same priority date as the appropriator. As also noted, this court declined to decide in *Nevada Ditch*, as between the appropriator and the user, who owned the

United States and the landowners own legal title to the water right jointly. That issue, however, is not before us, and we can answer the questions that the Federal Circuit has asked us without resolving it. Accordingly, we leave that issue for another day.

water right. It follows from *Nevada Ditch* that, in designating the United States as the appropriator of the water right, the legislature did not necessarily intend to signify that either the United States or the users owned the water rights. Rather, under *Nevada Ditch*, the meaning of that term was open at the time that the 1905 legislature used it. At a minimum, we find nothing in the legislature's use of that term that expresses an intent to preclude landowners and irrigation districts from acquiring a beneficial or equitable property interest in water rights that the United States has appropriated.

The different ways in which the 1891 and 1895 Oregon statutes describe the relationship between an appropriator and a user reinforce that conclusion. Under the 1895 statute, an irrigation district acquires and holds legal title to a water right but it holds that right in trust for the district's members who put the water to beneficial use. Or Laws 1885, p 13. Under the 1891 statute, at least as this court later interpreted it, a for-profit company that enters into annual rental agreements with its users owns the entire water right. *See Walla Walla River*, 141 Or at 498. And the 1901 statute implementing the Carey Act provided that "[t]he right to the use of water for irrigation of any tract or subdivision of lands reclaimed under the provisions of this act shall become and perpetually remain appurtenant thereto." Or Laws 1901, p 382, § 8. Given the various ways in which an appropriator can hold, share, or relinquish a property interest in the water it appropriates, we cannot say that, merely by providing that the United States may appropriate water rights pursuant to the 1905 act, the Oregon legislature intended to preclude landowners and irrigation districts from obtaining a beneficial or equitable property interest in water that the United States has appropriated.

A final contextual source bears on the issue. The Oregon legislature enacted the 1905 statute in response to Congress' passage of the Reclamation Act. It follows that the Reclamation Act, as originally passed, sheds light on the terms on which the Oregon legislature understood that the United States would hold the water right that the 1905 act authorized the United States to appropriate.[15] As noted, the

---

[15] The Federal Circuit's questions ask us to interpret state law. We cannot, however, interpret the meaning of the 1905 Oregon statute without considering the

Reclamation Act authorized the construction of federal irrigation works "for the storage, diversion, and development of waters for the reclamation of arid and semi-arid lands" in the Western states and territories. 32 Stat 388 § 1. Congress wanted to make water available to settlers who entered onto public land, and it provided for the issuance of patents for the land if, within a specified period of time, the settlers entering the land reclaimed "at least one-half of the total irrigable area of his [or her] entry for agricultural purposes" and paid within 10 years a proportionate share of the projected cost of the irrigation works. *Id.* § 5. Congress also provided for sale of water to privately owned land within the scope of the project, provided that the tracts did not exceed 160 acres and that the landowners repaid the proportionate share of the cost of constructing the irrigation works. *Id.*

In passing the Reclamation Act, Congress sought to make water rights available for the benefit of those persons who would use the water to reclaim the land. *See Ickes v. Fox,* 300 US 82, 95, 57 S Ct 412, 81 L Ed 525 (1937) ("Appropriation was made not for the use of the government, but, under the Reclamation Act, for the use of the land owners * * *."). Reading the 1905 Oregon statute in light of the Reclamation Act that the Oregon legislature sought to facilitate, we conclude that, in authorizing the United States to appropriate water for the construction of irrigation works, the Oregon legislature did not intend to give the United States carte blanche to use the water rights it appropriated in whatever way it chose. Rather, the Oregon legislature authorized the United States to appropriate state water rights pursuant to the 1905 act for the benefit of those persons who the Reclamation Act contemplated would put water to beneficial use. That context is directly at odds with the notion that, in providing for the United States to appropriate water rights, the legislature intended to preclude landowners and irrigation districts from acquiring a beneficial or equitable property interest in the water right.[16]

---

terms and purposes of the Reclamation Act that the Oregon statute was intended to facilitate.

[16] Plaintiffs ask us to resolve a related but separate question; they ask us to decide whether the water right that the United States appropriated is limited to the uses specified in the notice that it filed in 1905. The scope of the right that the United States appropriated is separate from the question whether plaintiffs have an equitable property interest in that right (whatever its scope). As we understand

The United States advances two reasons for reaching a different conclusion. First, it relies on *In re Waters of Umatilla River*, 88 Or 376, 168 P 922, 172 P 97 (1918). In that case, the Western Land and Irrigation Company's predecessor in interest had appropriated water pursuant to the 1891 Oregon statute at three points in time: in 1891, 1903, and 1907. *Id.* at 381-85. The initial question in that case was whether Western's predecessor in interest had abandoned the water that it appropriated in 1891. *Id.* at 381-82. This court held that it had. *Id.* at 382-83. The court then noted that the United States had appropriated water pursuant to the 1905 Oregon act. *Id.* at 384-85. It observed that the United States' compliance with the procedures set out in that statute "vested the United States with title" to the water specified in its notice and that the water rights that the United States held had a priority date of September 6, 1905. *Id.* at 385. It followed, the court held, that Western's 1903 appropriation took priority over the United States' 1905 appropriation, which in turn took priority over Western's 1907 appropriation. *Id.* at 385-86.

The decision in *Umatilla River* does not advance the United States' position that the Oregon legislature intended to preclude landowners and irrigation districts from acquiring a beneficial or equitable property interest in water rights that the United States appropriated. In determining the priority of the United States' water right in *Umatilla River*, the court neither considered nor addressed the relationship between the United States and the landowners who took water under that appropriation. Rather, the question before the court was the relative priority of competing appropriators (Western's predecessor in interest and the United States). *Umatilla River* has no bearing on our answer to the Federal Circuit's first question.

The United States also relies on the second sentence of section 2 of the 1905 act, which states:

the Federal Circuit's questions, they ask us to address the latter question, not the former. The scope of the water right that the United States appropriated in 1905 is a question for the state water rights adjudication, as well as the question of who holds legal title to that right. We express no opinion on those questions.

"No adverse claims to the use of the water required in connection with such plans shall be acquired under the laws of this State except as for such amount of said waters described in such notice as may be formally released in writing by an officer of the United States thereunto duly authorized * * *."

Or Laws 1905, ch 228, § 2. The United States reasons that this sentence "spell[s] out the situations where 'other parties' may obtain rights to waters identified by the United States in its notice." In the United States' view, plaintiffs' present litigation position demonstrates that their interests are adverse to the United States. It follows, the United States concludes, that, without a formal written release, plaintiffs have no claim to any beneficial or equitable property interest in the water that the United States appropriated pursuant to the 1905 statute.

The United States' argument rests on the assumption that, when the Oregon legislature enacted the 1905 statute, it would have understood that the landowners and irrigation districts that took water under the United States' appropriation would have an "adverse claim" to the water. That is not how that phrase was commonly used. As this court used those terms before 1905 in water rights disputes, "adverse claim" referred to one of two situations. The court used those terms to refer to a claim brought by a person who contended that he or she had a right to use water by adverse possession. *See, e.g., Beers v. Sharpe*, 44 Or 386, 394, 75 P 717 (1904); *Mattis v. Hosmer*, 37 Or 523, 532, 62 P 17, 62 P 632 (1900); *Bowman v. Bowman*, 35 Or 279, 283, 57 P 546 (1899); *Huston v. Bybee*, 17 Or 140, 147-48, 20 P 51 (1888) (all illustrating proposition). The court also used those terms to refer to a claim brought by another appropriator who contended that his or her water right had an earlier priority date. *See, e.g., Brown v. Baker*, 39 Or 66, 69, 65 P 799, 66 P 193 (1901); *Oviatt v. Big Four Mining Co.*, 39 Or 118, 126, 65 P 811 (1901); *Carson v. Gentner*, 33 Or 512, 518, 42 P 506 (1898) (illustrating that usage).

Conversely, the court had not described the relationship between an appropriator and those persons who took water under that appropriation as either "adverse" or as a "claim." *See Nevada Ditch*, 30 Or at 98. Rather, the court had

described the relationship as one of mutual cooperation. *Id.* It held out the possibility that the user was the agent for the appropriator, but found it unnecessary to decide that point because the parties' mutual efforts were necessary to effectuate a perfected appropriation under the common law. *Id.* We need not decide whether the legislature used the phrase "adverse claim" in the 1905 statute to refer to an adverse possession claim or the claim of an adverse appropriator to conclude that the 1905 legislature did not use that phrase as the United States contends—to refer to the United States' relationship with the persons who took water under its appropriation. In sum, we find nothing in the text and context of the 1905 statute that would preclude plaintiffs from acquiring a beneficial or equitable property interest in the water right appropriated by the United States.

## B

■     The Federal Circuit's second question asks:

"In light of the [1905] statute, do the landowners who receive water from the Klamath Basin Reclamation Project and put the water to beneficial use have a beneficial or equitable property interest appurtenant to their land in the water right acquired by the United States, and do the irrigation districts that receive water from the Klamath Basin Reclamation Project have a beneficial or equitable property interest in the water right acquired by the United States?"

As we understand the second question, it asks whether beneficial use alone is sufficient to acquire a beneficial or equitable property interest in a water right to which another person holds legal title. The answer to that question, as we have restated it, is "no." Beneficial use is a necessary but not a sufficient condition to acquire a beneficial or equitable property interest in a water right. In explaining our answer, we first address an assumption that underlies the court's question—whether, under Oregon law, one person can hold a beneficial or equitable property interest in a water right to which another person holds legal title. We then explain why beneficial use alone is not sufficient. Finally, we explain what, as a matter of Oregon law, is required to establish a beneficial or equitable property interest in a water right.[17]

_____

[17] In answering the Federal Circuit's second question, we address only whether plaintiffs acquired a beneficial or equitable property interest under state law. The

## 1

■    Oregon has recognized since 1862 that one person may hold legal title to property and that another person may hold equitable title to that property. *See Smith v. Ingles*, 2 Or 43, 44-45 (1862) (when defendant caused property to be conveyed to his sons for defendant's use and benefit, the sons held legal title to the property and defendant held equitable title). That rule applies equally to water rights. *Eldredge*, 90 Or at 594 (recognizing that one person could hold legal title to a water right while another holds equitable title). As this court explained in *Fort Vannoy*, "[t]he existence of [a] trust relationship [between an irrigation district and its members] bifurcates the ownership interest in each certificated water right." 345 Or at 86. "The district holds legal title to the water right as trustee, and the members hold equitable title as the beneficiaries." *Id.*; *see also id.* at 87 (referring to an irrigation district member's "equitable ownership interest" in the water right).[18]

■    In Oregon, equitable property interests in water rights have not derived solely from formal trust agreements. For instance, this court recognized that beneficial users who transferred appropriated water rights to a corporation and took shares in the corporation in return held an equitable ownership interest in the water right. *Silvies River*, 115 Or at 102-03. In reaching that conclusion, the court explained that the corporation was formed "for the purpose of enabling the various owners of land to have a system that would serve all of them"; that is, even though the corporation held legal title to the water right, it held the water right for the use and benefit of its members. *Id.* at 98-99. That was sufficient for the court to conclude that the shareholders held an equitable property interest in the water right.[19] As the court explained,

question whether that state property interest, if acquired, gives rise to a federal takings claim is a matter of federal law that goes beyond the scope of the court's questions, and we do not address it.

[18] In *Fort Vannoy*, a statute provided that the irrigation district held the water right in trust for its members. *See* 345 Or at 85 (citing ORS 545.239). The court held, however, that the common law established that, as a consequence of that trust relationship, the district had legal title to the right while the members held equitable title. *See id.* at 86 (looking to common law to determine the effect of the trust relationship).

[19] The specific issue in *Silvies River* was whether the priority date for the corporation's water right related back to a notice of appropriation signed by the

"[a] court of equity will look beyond the form of the proceeding and if possible consider the substance of the right." *Id.* at 103.

This court has reached the same conclusion without regard to whether the shareholders in a corporation appropriated a water right and transferred that right to the corporation or whether the corporation appropriated the water right and held it for the use and benefit of its shareholders. *See In re Water Rights of Willow Creek,* 119 Or 155, 195, 199, 236 P 487, 237 P 682 (1925) (corporation held appropriated water right in trust for the benefit of its shareholders who put the water to beneficial use); *Eldredge,* 90 Or at 596 (explaining that a mutual water company organized for the purpose of transmitting and delivering water appropriated by its shareholders held the water right as a trustee for the use and benefit of its shareholders). That is, even though the shareholders owned the stock and the corporation owned the water right, the court, sitting in equity, "look[ed] beyond" that formal arrangement and, considering its substance, ruled that the persons who put the water to beneficial use held an equitable property interest in the water right.

■    We draw two conclusions from those cases. First, the premise of the Federal Circuit's question is well-founded. Oregon has recognized and continues to recognize that persons who put water to beneficial use can acquire an equitable or beneficial property interest in a water right to which someone else holds legal title. Second, in determining when such an equitable property interest in a water right exists, this court looks beyond form and focuses on substance. The court has sought to determine from the structure of a particular relationship and the agreements among the parties to that relationship whether the party that holds legal title to the right does so for the use and benefit of the persons who put the water to beneficial use.

2

With that background in mind, we return to the Federal Circuit's second question: Is beneficial use alone sufficient to create a beneficial or equitable property interest in

---

shareholders but not the corporation. 115 Or at 98-99. The court concluded that, because the corporation held the right for the use and benefit of its members, the signatures of the shareholders were sufficient. *Id.* at 102.

a water right to which another person holds legal title? We answered that question "no" because this court has held that beneficial use of water does not always give the user a property interest in a water right that another person appropriated. *Walla Walla River*, 141 Or at 497-98. It follows that we cannot say, without qualification, that beneficial use alone is sufficient under Oregon law to obtain an equitable property interest in a water right. Two other factors bear on the analysis. As discussed above, in deciding the respective property interests of the appropriator and the user of a water right, this court has looked not only to beneficial use but also to the relationship between the parties, as well as any contractual agreements between them. *See id.* at 497-98 (looking to the nature of the relationship and the contractual agreements); *Silvies River*, 115 Or at 98-102 (looking at the nature of the relationship); *Eldredge*, 90 Or at 596 (looking to the nature of the relationship); *Nevada Ditch*, 30 Or at 98 (holding out the possibility that contractual agreements matter).

The United States Supreme Court considered similar factors in deciding that, even though the United States held legal title to the water right for the Newlands Project (a Reclamation Act project in Nevada), the landowners who had put the water to beneficial use held a beneficial or equitable property interest in the water right. *Nevada v. United States*, 463 US 110, 122-26 and n 9, 103 S Ct 2906, 77 L Ed 2d 509 (1983). In that case, landowners had settled on land within the Newlands Project and had entered into contractual agreements with the United States for water. *Id.* at 126 n 9. The Court explained that five different forms of contracts had been used since the creation of the Newlands Project. *Id.* "Two of the forms provide[d] for an exchange of a vested water right by the landowner in return for the right to use Project water." *Id.* The other three forms of contracts provided a water right in an amount that may be beneficially applied to a specified tract of land. *Id.* The Court noted that, of the three latter forms, the one most commonly used was an application for a permanent water right for the irrigation of the settler's land. *Id.*

In 1913, the United States filed suit in federal district court, the *Orr Ditch* suit, to adjudicate the water rights to the Truckee River for the benefit of the Pyramid Lake

Indian Reservation and the Newlands Project. *Id.* at 113. Neither the landowners nor the tribe appeared in that suit. *Id.* at 121. As a result of that suit, the United States acquired title to the water right for both reclamation and reservation use in 1944.

In 1973, the United States sought to reallocate the water decreed to it. *Id.* at 121. More specifically, the United States sought to divert water that it had acquired for reclamation use to another federal use and argued that, because it owned the water right, it was free to do so. *Id.* The Court reached a different conclusion. It explained that, even though the United States held legal title to the water right, it held the water right in trust for the landowners. As the Court explained,

> "Once these lands were acquired by settlers in the Project, the Government's 'ownership' of the water rights was at most nominal; the beneficial interest in the rights confirmed to the Government resided in the owners of the land within the Project to which these water rights became appurtenant upon the application of Project water to the land."

*Id.* at 126; *see also id.* at 127 (explaining that the United States, in arguing that it could reallocate the water to a different use, had overlooked "the obligations that necessarily devolve upon it from having mere title to water rights for the Newlands Project, when the beneficial ownership of these water rights resides elsewhere").

■    In determining that the landowners had an equitable or beneficial property interest in the water right to which the United States held legal title, the Court considered three factors: (1) under state law, the water right became appurtenant to the land once it was put to beneficial use;[20] (2) the United States' relationship with the landowners under the Reclamation Act; and (3) the contracts between the United

---

[20] The Court explained that, under Nevada law, beneficial use was necessary to perfect appropriation and that the right became appurtenant to the land on which it was used. 463 US at 126. As discussed above, the Federal Circuit's questions assume that the United States appropriated the water right, and we need not decide, in answering the court's questions, whether, under Oregon law, beneficial use was necessary to perfect the United States' appropriation of water rights under the 1905 act. *See* note 14 above (reserving that issue).

States and the landowners. *Id.* at 121-26 and n 9. The Court's reasoning in *Nevada* does not bind us in deciding, as a matter of state law, whether one party holds a water right in trust for another. However, we find its analysis both persuasive and consistent with Oregon law. We turn to a consideration of those factors.

3

■ The first factor is whether the water right was appurtenant to the land. Under Oregon law, the water right became appurtenant to the land once the persons taking the water from the Klamath Project applied it to their land and put it to beneficial use. That is true even if those persons had not yet perfected title to the land. As the court explained in *Hindman*, settlers who entered onto public land (but who had not yet perfected title to the land) acquired "a valuable property right [in the land] which the courts will protect and enforce," and the water they put to beneficial use became appurtenant to the land. 21 Or at 116-17. The court was careful to note in *Hindman* that, until the settlers perfected title to the land, the possessory right in the land that the settler acquired was valid against every person except the government. *Id.* at 117. That reservation, however, merely recognized that, if the United States cancelled the entry because the settler failed to comply with its terms, the settler could lose his or her right to the land and, along with it, the appurtenant water right. This court did not suggest that the settler lacked a valuable property right in the water that the state courts would not recognize and protect.[21]

The second factor requires us to determine the relationship that exists between the federal government and plaintiffs. In the United States' view, it stands in the same relationship to the water users as the private for-profit company did in *Walla Walla River*; that is, the United States

---

[21] *Hindman* discusses publicly held land that a settler reclaims and acquires. Section 5 of the Reclamation Act also addresses privately held land. It provides that "no such right [a right to the use of water] shall permanently attach [to the privately held land] until all payments therefore are made." 32 Stat 389, § 5. Section 5 thus recognizes that, even though water put to beneficial use on privately owned land will become appurtenant to the land, the right does not attach permanently until the landowner pays his or her proportionate share of the cost of constructing the irrigation works.

contends that it owns the entire water right and that plaintiffs have only a contractual right to receive the water. Plaintiffs and the State of Oregon argue that, although the United States holds title to the water right, it does so for the use and benefit of the landowners who put the water right to beneficial use. In their view, the relationship between the United States and plaintiffs is closer to that of the corporation and its shareholders in *Silvies River* or *Eldredge*.

Neither party's analogy is perfect. The United States is not a corporate entity (either a for-profit corporation as in *Walla Walla River* or a mutual water company as in *Eldredge*), and plaintiffs are not its shareholders. However, the Court's decision in *Nevada v. United States* persuades us that the United States holds the water right that it appropriated pursuant to the 1905 Oregon act for the use and benefit of the landowners. In explaining that the United States held the water right it acquired in the *Orr Ditch* suit in trust for the landowners in the Newlands Project, the Court explained that "the primary purpose of the Government in bringing the *Orr Ditch* suit in 1913 [and obtaining title to the water rights in the decree] was to secure water rights for the irrigation of land that would be contained in the Newlands Project, and that [in doing so] the Government was acting under the aegis of the Reclamation Act of 1902." 463 US at 121. In support of that statement, the Court noted that, in filing the *Orr Ditch* suit, the United States had alleged that the "litigation was designed to quiet title to the Government's right to the amount of water necessary to irrigate the lands set aside for the [Newlands] Project," and that the decree entered in that suit gave the United States title to the water " 'for the irrigation of 232,800 acres of land on the Newlands Project, for storage in the Lahontan Reservoir, for generating power, for supplying the inhabitants of cities and towns on the project and for domestic and other purposes.' " *Id.* at 121 n 8 (quoting decree).

That persuaded the Court that, in obtaining title to the water under the aegis of the Reclamation Act, the United States was not acting for its own benefit but for the benefit of the persons who put the water to beneficial use reclaiming the land. As the Court explained in *Ickes*, 300 US at 95, and reiterated in *Nevada*, 463 US at 123, "[a]ppropriation was

made not for the use of the government, but, under the Reclamation Act, for the use of the land owners." The same conclusion applies equally here. In appropriating water pursuant to the 1905 Oregon act, the United States was acting under the aegis of the Reclamation Act, and the notices that it filed in Oregon stated that it was appropriating the water for virtually the same uses that the United States stated that it was acquiring title to the water in *Nevada*. In appropriating water under the 1905 act and pursuant to the Reclamation Act, the United States was not acting as a for-profit company, as in *Walla Walla River*, but was instead appropriating water for the use and benefit of landowners who would put it to beneficial use reclaiming the land.[22]

The United States argues that *Nevada*, *Ickes*, and a third case, *Nebraska v. Wyoming*, 325 US 589, 65 S Ct 1332, 89 L Ed 1815 (1945), are all distinguishable on their facts. We agree that *Ickes* and *Nebraska* are distinguishable, at least as the parties have presented this case to us. In both those cases, the Court concluded that the landowners had acquired title to the water.[23] In this case, by contrast, the parties have assumed that the United States holds the title to the water right. *Nevada*, on the other hand, is far closer to this case. In *Nevada*, the United States held title to the water right as a result of the *Orr Ditch* suit, and we assume that the United States holds title to the right here. But, regardless of whether distinctions could be drawn between *Nevada* and this case, we think that the United States' argument misses the larger point. In that case, as well as in *Ickes* and *Nebraska*, the

---

[22] To be sure, Congress required persons taking water from a reclamation project to repay a proportionate share of the costs of constructing the irrigation works. But the same was true in both *Ickes* and *Nevada*. The payments were not intended for the United States to turn a profit but to make the reclamation program self-funding.

[23] In *Ickes*, the landowners had entered into contracts with the Secretary of the Interior to acquire water rights from a reclamation project by repaying the proportionate share of the project's cost in ten annual installments. 300 US at 89-90. The Court explained that the landowners "had made all stipulated payments and complied with all obligations by which they were bound to the government, and * * * had acquired a vested right to the perpetual use of the waters as appurtenant to their lands." *Id.* at 94. In *Nebraska*, the landowners applied for and received state water rights certificates as a result of putting the water to beneficial use on their land. 325 US at 613. In both cases, the court concluded that the landowners acquired the water right.

Court recognized that, in acquiring water rights under the aegis of the Reclamation Act, the United States was not acting for its own benefit, but for the benefit of those persons who Congress intended would put the water to beneficial use reclaiming the land. That consistent recognition of the relationship created by the Reclamation Act persuades us that, as a matter of state law, the relationship between the United States and plaintiffs is similar to that of a trustee and beneficiary.

The third factor is the contractual agreements between the United States and plaintiffs. That factor bears on the second. Even though we have concluded that, in appropriating the right to use the waters in the Klamath Basin, the United States did so for the benefit of the landowners, the United States and plaintiffs remained free within statutory and constitutional limits to enter into agreements that clarified, redefined, or even altered that relationship. Whether they did so requires a full consideration of the agreements between plaintiffs and the United States. On that point, it appears that various plaintiffs have entered into different forms of agreement with the United States and that those agreements have been renegotiated, perhaps more than once, since the Klamath Project began.

In attempting to assess the effect of the parties' agreements on the relationship between them, we face a significant difficulty. All the agreements between the United States and plaintiffs in the present litigation do not appear to be before us.[24] The Court of Federal Claims summarized the types of agreements that the parties entered into, and it quoted portions of those agreements. However, we hesitate to rely on that summary of the parties' agreements when, in assessing the effect of those agreements on the state law issue that the second certified question presents, we might view other aspects of the agreements or their significance under state law differently. We also note that the Court of

---

[24] Plaintiffs included four agreements in their excerpts of record and the record discloses other agreements. Not only does it appear from the Court of Federal Claims decision that many other agreements exist, but the parties have not briefed either the history or the significance of those different agreements in any detail.

Federal Claims' assessment of the significance of the agree-
ments may rest on a misperception of state law. The Court of
Federal Claims explained that, under the 1905 Oregon act,
plaintiffs could obtain a property interest in the water right
that the United States appropriated only if the United States
executed a formal written release of that interest, and it con-
cluded that none of those agreements was sufficient to give
plaintiffs anything other than a contractual right to receive
water. As explained above, however, that understanding of
the 1905 Oregon law is not correct.

We are aware that the agreements that the Court of
Federal Claims described in its decision are similar to the
two forms of agreement that the Court concluded in *Nevada*
supported its determination that the United States held title
to the water rights in that case in trust for the landowners.
However, without all the agreements before us and without
briefing on them, we are in no position to provide a definitive
answer whether, as a matter of state law, the various con-
tractual agreements between the United States and plain-
tiffs support or defeat plaintiffs' claim that they have an equi-
table or beneficial property interest in the water right that
the United States appropriated pursuant to the 1905 act.

For instance, we cannot foreclose the possibility that
plaintiffs could have bargained away any equitable or legal
right to the water in return for a reduced payment schedule
or forgiveness of their debt. Conversely, the United States
may have granted plaintiffs either patents, water rights, or
contractual rights that would be sufficient, as a matter of
state law, for plaintiffs to have acquired at a minimum an
equitable property interest in the water.[25] In sum, whatever
conclusion we might draw on the basis of the first two factors

---

[25] We also note that some of the agreements that the Court of Federal Claims
mentioned, coupled with the fact that the parties have stipulated that plaintiffs
have paid all the costs of irrigation works, suggest that plaintiffs may themselves
hold a vested water right. *See Ickes*, 300 US at 94 (explaining that the landowners
in that case had acquired a vested water right by paying their proportionate share
of the irrigation project's construction costs and complying with their other con-
tractual obligations). We express no opinion on that point but mention it only to
note that the procedural posture in which this case arises poses additional difficul-
ties in answering the court's second question; that is, it is difficult to discuss in the
abstract whether plaintiffs have an equitable interest in the water right in light of
facts that suggest that some or all of them may have a greater property interest.

noted above and whatever conclusion the Court of Federal Claims' summary of the various agreements might suggest, we lack a sufficient basis to provide a definitive answer to the court's second question.

## C

The Federal Circuit's third question asks:

"With respect to surface water rights where appropriation was initiated under Oregon law prior to February 24, 1909, and where such rights are not within any previously adjudicated area of the Klamath Basin, does Oregon State law recognize any property interest, whether legal or equitable, in the use of the Klamath Basin water that is not subject to adjudication in the Klamath Basin Adjudication?"

The answer to the Federal Circuit's third question is "yes." A person asserting only a beneficial or equitable property interest in a water right is not a "claimant" who must appear in the Klamath Basin adjudication and file a claim to determine that interest. Conversely, a person who claims legal title to a water right must file a claim in the adjudication or lose the right.[26]

In answering the court's third question, we begin with the text of ORS 539.210, which governs adjudication of pre-1909 water rights. That statute provides in part:

"Whenever proceedings are instituted for determination of rights to the use of any water, it shall be the duty of all claimants interested therein to appear and submit proof of their respective claims, at the time and in the manner required by law. Any claimant who fails to appear in the proceedings and submit proof of the claims of the claimant shall be barred and estopped from subsequently asserting any rights theretofore acquired upon the stream or other body of water embraced in the proceedings, and shall be held to have forfeited all rights to the use of the water theretofore claimed by the claimant."

---

[26] Our answer to the court's question is limited to the facts, as we understand them to exist in the Klamath Basin adjudication—*i.e.*, that the United States has filed a claim for legal title to the water right that it appropriated under the 1905 Oregon statute. We express no opinion on the permissible procedure if the person who appropriated the water right fails to file a claim for that right in the water rights adjudication, and another person claims only an equitable interest in that right.

The United States argues that "[l]andowners asserting vested property rights in the use of water diverted by the Klamath Project are 'claimants' interested in the 'determination of rights to the use' of the water in the Klamath Basin. Accordingly, any such rights must be claimed in the [a]djudication or be forfeited." Plaintiffs and the State of Oregon argue that, under Oregon law, a state water rights adjudication is a comprehensive proceeding to determine the relative rights of persons who have appropriated water rights and, as a consequence of that determination, issue water rights certificates. They argue that persons holding derivative rights, whether in equity or contract, are not claimants within the meaning of ORS 539.210 and need not file a claim in the water rights adjudication.

Oregon's water code does not define the term "claimant," and both the United States and plaintiffs have proposed plausible interpretations of that term. The statutory context, however, cuts against the United States' interpretation in two respects. First, what is now ORS 539.210 was first enacted as part of Oregon's 1909 water code, and the current version of ORS 539.210 is virtually identical to that provision as it first was enacted. *Compare* ORS 539.210, *with* Or Laws 1909, ch 216, § 34. When the Oregon legislature adopted the 1909 code, it did not define the term "claimant." However, it used that term to refer to a person who had appropriated a water right and could thus claim legal title to the right; for example, it required "claimants" to file a statement setting out facts necessary to establish an appropriation. *See* Or Laws 1909, ch 216, § 14. Conversely, it did not require "claimants" to file a statement showing that they had a right to take water under another person's appropriation. Given that context, we conclude tentatively that the term "claimant," as used generally in the 1909 act and as used specifically in the section that became ORS 539.210, does not refer to a person asserting only an equitable or beneficial property interest in a water right that another person appropriated.

A second statutory clue points in the same direction. Under Oregon's water code, a claim for water, if proved, results in the issuance of a certificated water right giving the holder title to the right. *See Fort Vannoy*, 345 Or at 84 (describing that process); ORS 539.140 (same). A person

claiming an equitable interest in a water right does not receive a certificated right. *See Fort Vannoy*, 345 Or at 84-86 (recognizing that a member of an irrigation district had an equitable interest in a certificated water right issued to the district). By implication, a person holding an equitable interest need not file a claim in a water rights adjudication and is thus not a "claimant" within the meaning of ORS 539.210.

■    That has long been the rule in Oregon. As this court explained 85 years ago, "[i]f this were a proceeding for determining the relative rights between different appropriators [*i.e.*, a streamwide adjudication], the court would not consider the controversy between an appropriator and those claiming under him." *Willow Creek*, 119 Or at 191. Under Oregon law, controversies between appropriators and those claiming under them are not part of a water rights adjudication to determine the relative rights of different appropriators. The court has, however, recognized one exception, and that exception proves the rule, as the facts in *Willow Creek* illustrate.

In *Willow Creek*, two persons had initiated a water rights adjudication in 1909 to determine the right to use the water in Willow Creek. *Id.* at 163.[27] The Willow Creek Land and Irrigation Company (the irrigation company) had appropriated water from that creek for others' use, and the irrigation company (but not its shareholders who claimed a beneficial property right) appeared in the 1909 adjudication. *Id.* at 163, 181-82. Some of the irrigation company's water rights "had become vested through appropriation and use, while others were at that time inchoate." *Id.* at 163. Recognizing that fact, the first decree entered in 1916 provided that the irrigation company would be allowed until January 1, 1918, "to complete its said irrigation system and apply the impounded waters to beneficial use." *Id.* at 163-64.[28]

---

[27] The water rights adjudication in *Willow Creek* arose under Oregon's 1909 water rights code. *See In re Willow Creek*, 74 Or 592, 144 P 505, 146 P 475 (1915) (considering challenges to the procedure that gave rise to the first decree regarding Willow Creek).

[28] The inchoate water rights apparently resulted from the common-law rule, stated in *Nevada Ditch*, that one person can appropriate water for future users with an appropriation date that relates back to the date of the notice, as long as the water is diverted and put to beneficial use within a reasonable time. In *Willow Creek*, the 1909 streamwide adjudication occurred before a reasonable time had

In 1920, the state gave notice to all parties interested in the inchoate rights of the irrigation company to appear and determine the extent to which those inchoate rights had been realized. The irrigation company[29] appeared at the supplemental proceeding and argued that the only issue properly before the court was the extent to which water had been put to beneficial use—*i.e.*, the extent to which the inchoate rights had been realized. Persons who had agreed to purchase land and appurtenant water rights from the irrigation company appeared and claimed that the irrigation company unlawfully had prevented them from putting water to beneficial use on their lands by putting the water to use instead on the company's lands. *Id.* at 182, 191-92. Those persons did not own the water rights directly but held shares in the irrigation company, which claimed legal title to the water right. *Id.* at 165.

In resolving the parties' arguments, this court noted that the only issue before it was the right to water under a single certificate and that the disputes between an appropriator and persons taking under the appropriator "ordinarily would not be considered in a proceeding of this nature"—*i.e.*, in a supplemental proceeding to adjudicate rights among different appropriators. *Id.* at 182. The court reasoned, however, that it could not determine the land on which the water had been put to beneficial use and thus could not issue a water rights certificate to the irrigation company without first resolving the subsidiary dispute between the irrigation company and the persons who took water under it. *Id.* In resolving that subsidiary dispute, the court held that the irrigation company could not use the water it had appropriated to benefit its land to the detriment of the persons who had

---

passed, with the result that the 1916 decree recognized that the irrigation company held inchoate water rights but that the court could not determine the extent of those rights at that time.

[29] Between the 1909 adjudication and the 1920 supplemental adjudication, the irrigation company transferred the irrigation works and the water rights to a holding company. *Willow Creek*, 119 Or at 165, 179. The irrigation company sold land to settlers and gave them a proportionate share of the stock in the holding company. *Id.* at 165. The irrigation company also went into bankruptcy during that period, and another corporation acquired its remaining assets. *Id.* Those corporate changes are not material to our answer to the Federal Circuit's third question, and we have referred solely to the "irrigation company" for ease of reference.

acquired land and derivative water rights from it. *Id.* at 196-98. The court determined the land to which the water rights attached and held that the irrigation company "is entitled to a certificate of its water right for the benefit of the land owned by its stockholders." *Id.* at 199.

*Willow Creek* is telling in at least four respects. First, the court recognized that the irrigation company held the water right for the benefit of the stockholders. Second, the court did not hold that the stockholders' failure to file a claim in the initial adjudication precluded them asserting an equitable interest in the certificated water right that the irrigation company sought. Third, the court recognized that, as a general rule, the only claims that will be adjudicated in a water rights adjudication are the competing claims of different appropriators, not the equitable interests of those persons who take under an appropriator. Finally, it held that that rule is not without exceptions; controversies between an appropriator and the persons who take under that appropriator may be resolved in a general adjudication when necessary to determine the extent of a certificated water right.

■ Given *Willow Creek* and the other statutory context discussed above, we conclude that the term "claimant" in ORS 539.210 refers to persons claiming legal title to a water right. The term does not include persons asserting only an equitable or beneficial interest in a water right that another person appropriated. It follows that, to the extent that plaintiffs assert only a beneficial or equitable property interest in water rights that the United States appropriated, plaintiffs are not claimants within the meaning of ORS 539.210 who must file claims in the Klamath Basin adjudication or lose their right to claim a beneficial or equitable property interest in that water right.

It is necessary to add a caveat to our answer. Given the limited record before us, we cannot foreclose the possibility that circumstances comparable to those in *Willow Creek* might arise in the Klamath Basin adjudication that would permit, in that adjudication, the determination of the interests of persons claiming an equitable or beneficial property

interest in a water right that another person had appropriated. Subject to that caveat, however, we can say that persons asserting only an equitable or beneficial property interest in a water right that someone else appropriated are not "claimants" within the meaning of ORS 539.210 who must file claims in the Klamath Basin adjudication.

## IV

In summary, in answering the Federal Circuit's questions, we have assumed that the United States appropriated the right to use the waters described in its notice and that it presently holds legal title to that water right. We also have assumed that plaintiffs are asserting only an equitable or beneficial property interest in the water right to which the United States holds legal title. Who presently holds legal title to that water right and the scope of that right are questions for the Klamath Basin adjudication, and we express no opinion on those issues. Given those assumptions, we have answered the court's questions as follows:

1. The 1905 Oregon act did not preclude plaintiffs from acquiring an equitable or beneficial property interest in a water right to which the United States holds legal title. Moreover, under the 1905 act, a formal written release from the United States is not necessary for plaintiffs to have acquired an equitable or beneficial property interest in the water right that the United States appropriated.

2. Under Oregon law, whether plaintiffs acquired an equitable or beneficial property interest in the water right turns on three factors: whether plaintiffs put the water to beneficial use with the result that it became appurtenant to their land, whether the United States acquired the water right for plaintiffs' use and benefit, and, if it did, whether the contractual agreements between the United States and plaintiffs somehow have altered that relationship. In this case, the first two factors suggest that plaintiffs acquired a beneficial or equitable property interest in the water right to which the United States claims legal title, but we cannot provide a definitive answer to the court's second question because all the agreements between the parties are not before us.

3. To the extent that plaintiffs assert only an equitable or beneficial property interest in the water right to which the United States claims legal title in the Klamath Basin adjudication, plaintiffs are not "claimants" who must appear in that adjudication or lose the right. As a general rule, equitable or beneficial property interests in a water right to which someone else claims legal title are not subject to determination in a state water rights adjudication.

The certified questions are answered.

**WALTERS, J.,** concurring.

The court answers "no" to the restated second question posed by the Federal Circuit: whether, under Oregon law, beneficial use alone is sufficient to acquire a beneficial or equitable property interest in a water right to which another person holds legal title. 348 Or at 40-41.[1] I agree with that answer and with the majority's further statement that, even considering additional factors, we cannot reach a definitive answer to a more pointed question—whether plaintiffs in this case acquired a beneficial or equitable property interest in a water right held by the United States. 348 Or at 50.

I write to explain the reasons that the latter, more specific, question is an open one that, in my view, cannot be resolved at this time on this record.

First, this case reaches us in a posture in which the following issues are contested in the Klamath Basin adjudication and have not been decided by any court: (1) whether beneficial use is necessary to the United States' appropriation of water rights; (2) whether the United States has appropriated the water rights at issue here; and (3) whether plaintiffs also have appropriated water rights and own them independently or jointly with the United States. 348 Or at 36 n 14. In answering the questions posed by the Federal Circuit, we are nevertheless asked to assume that the United States has appropriated and acquired sole ownership of the water rights at issue. *See* 348 Or at 36-37 ("[W]e assume that the United States appropriated water rights pursuant to the

---

[1] We do not expressly consider the interests of irrigation districts that "receive" water from the Klamath Basin Reclamation Project.

1905 statute and that it acquired and presently holds legal title to use the water for the purposes stated in its notice.") (footnote omitted); *see also* 348 Or at 55 (summarizing assumptions used in answering certified questions). In other words, we are asked to assume that the United States has accomplished whatever measures were necessary to perfect appropriation, without deciding whether beneficial use by landowners was one of those measures and without deciding whether plaintiffs also appropriated and acquired ownership of the rights at issue.

When this court previously has considered the nature of the interests of water users or providers, it has done so on the premise that beneficial use is a necessary prerequisite to perfection of appropriation and in the context of discussing perfected (and sometimes certificated and thereby vested) appropriation. As the majority explains, it has been the law in Oregon since at least 1896 that appropriation is perfected "only when the ditches and canals are completed, the water diverted from its natural stream or channel, and actually used for beneficial purposes." *Nevada Ditch Co. v. Bennett*, 30 Or 59, 90, 45 P 472 (1896). Thus, as the court recently stated, in *Fort Vannoy Irrigation v. Water Resources Comm.*, 345 Or 56, 88, 188 P3d 277 (2008), a joint effort between landowners and irrigation companies or districts has been required to "bring the certificated water rights into existence" and beneficial use has been one action required in that joint effort.[2] When we are asked to assume instead, as we understand that we have been instructed to do, that beneficial use may *not* be necessary to perfected appropriation, and that plaintiffs do not hold perfected or certificated interests, our precedent, premised as it is on different assumptions, is of little assistance.

Second, the Federal Circuit Court has not defined what it means by the term "beneficial or equitable property interest." This court's prior consideration of the nature of the interests held by landowners who apply water to beneficial

---

[2] In *Fort Vannoy*, the water rights at issue were not only appropriated, they were also certificated. As the court explained in that case, "the issuance of a water right certificate is the act that vests a certificated water right in a party. *See, e.g.*, ORS 537.250(3) (describing significance of issuance of water right certificate)." *Fort Vannoy*, 345 Or at 76.

use has not been for the purpose of determining whether those interests are "property" as that term is used in the United States or Oregon Constitutions or whether the government must pay just compensation if it "takes" those interests.[3] When the court's prior cases use terms such as "equitable title," or liken the relationships between the parties to other equitable relationships, they do so not only on the basis of assumptions that are inapplicable here, but also for the purpose of answering legal questions very different from the one that the Federal Circuit poses. A brief survey of the questions addressed in those cases demonstrates my point.

In *Eldredge v. Mill Ditch Co.*, 90 Or 590, 177 P 939 (1919), this court concluded that a quasi-public irrigation company served as the agent of its stockholders when it delivered water for their use. The court held that equity precluded a third-party judgment creditor from forcing a sale of the company's interests to the detriment of the stockholders. *Id.* at 596.

*Re Rights to Waters of Silvies River*, 115 Or 27, 237 P 322 (1925), was a case in which three men posted a notice of appropriation and then formed a corporation to serve as their agent in constructing irrigation ditches and making water available for use. The court held that the priority date for the water right that the corporation acquired related back to the date of the men's original notice of appropriation. *Id.* at 98-103.

In *In re Waters of Walla Walla River*, 141 Or 492, 16 P2d 939 (1933), this court reached a different conclusion concerning a disputed priority date. The court held that a private irrigation company that had appropriated water in 1903 was the principal and that landowners who were not shareholders in the company, but who put its water to beneficial use pursuant to rental contracts, served as the company's agents. When some of the landowners later formed a new irrigation

---

[3] As we noted in *Doyle v. City of Medford*, 347 Or 564, 570 n 4, 227 P3d 683 (2010), the question whether a state interest amounts to a federally protected property interest (in that case under the Due Process Clause) is a federal question. Although we can describe state interests, the legal conclusion as to whether those interests constitute "vested rights" or "property" is a federal question.

company, the new water rights acquired did not relate back to the earlier 1903 appropriation because the landowners previously had not obtained "any rights in the use of the water supplied by [the original company] except those given by, and to the extent of, their rental contracts." *Id.* at 498.

In *Fort Vannoy*, the court noted that a statute that required an irrigation district to hold all property it acquired "in trust for * * * the uses and purposes set forth in the Irrigation District Law," gave rise to a trust relationship between the irrigation district and its members, 345 Or at 85-86 (emphasis omitted), but the court characterized the relationship between the district and the landowners who put the water to beneficial use as one of principal (district) and agents (landowners). *Id.* at 88-90. To resolve the particular question before it, the court looked to the statutory allocation of rights and responsibilities between the irrigation district, on the one hand, and its members and water users, on the other hand, and concluded that neither the members nor the users were "holder[s] of any water use subject to transfer." Therefore, the court held, the members did not have the right to change the point of diversion associated with the water right. *Id.* at 86-93.

Although in each of those cases "the water of a public stream [was] eventually applied to a beneficial use, and the general purposes of such appropriations accomplished," *Nevada Ditch*, 30 Or at 98, factors other than intended benefit or use determined the answers to the particular legal questions presented. And, for the most part, those cases involved the rights of third parties *vis-à-vis* the irrigation districts. Only *Fort Vannoy* decided the nature of the interests acquired by water users. In that case, it was the statutory allocation of rights and responsibilities, not whether the legislature intended that users benefit by the actions of irrigation districts, that was determinative.

Labels and short-hand descriptions used by the court in particular contexts for particular purposes do not resolve other legal questions, particularly difficult ones. In enacting and proceeding under the Reclamation Act, the United States intended, among other things, to provide some

benefit to the lands that it helped to irrigate. Our cases, however, have not decided whether a government's intent to bestow such a benefit alone creates an interest of legal consequence. Without actually resolving the threshold legal issue of whether beneficial use is necessary to perfected appropriation by the United States, without a clear understanding of the federal standard that a "beneficial or equitable property interest" must meet, and without all the facts necessary to determine whether that standard has been met, we certainly can say that the answer to the Federal Circuit Court's second question is "no," but I emphasize that that is all that we can say.

Balmer and Linder, JJ., join in this opinion.