404                 March 5, 2025                 No. 181

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

COURTNEY GAYLE WILDEBOER,
*Defendant-Appellant.*

Grant County Circuit Court
21CR27110; A178436

Wes Williams, Judge.

Argued and submitted February 7, 2024.

Daniel C. Silberman, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Joanna Hershey, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Joyce, Judge, and Kistler, Senior Judge.*

KISTLER, S. J.

Affirmed.

_____
* Kistler, S. J., *vice* Jacquot, J.

**KISTLER, S. J.**

Defendant appeals a judgment for driving under the influence of intoxicants (DUII). She raises one assignment of error on appeal. She argues that the trial court erred in denying her request for a less-satisfactory-evidence instruction. We affirm.

An Oregon State Police trooper saw defendant driving 75 miles per hour in a 65-mile-per-hour zone. It had been raining and sleeting, and the road was wet. Traveling at 75 miles an hour, defendant's car rapidly approached a slower moving truck. Although defendant delayed applying her brakes, her delay did not cause her car to hit the truck, nor did it cause her car to skid or swerve out of her lane.

The trooper stopped defendant for exceeding the speed limit. When he approached her car, he saw that defendant had "droopy eyelids." She was talking out of the corner of her mouth and her speech "seemed slurred." She had burn marks on her fingers and sores on her arm, both of which were consistent with methamphetamine use. He saw a glass pipe in the center console of her car, which could be used for either methamphetamine or marijuana. A later search incident to arrest of the passenger compartment produced a dab bong, which is used to smoke a concentrated form of marijuana, a butane torch, which can be used to heat a dab bong, and used marijuana vape pens. Additionally, defendant told the trooper that she had marijuana in the car but that it belonged to a friend.

Based on his observations, the trooper initially asked defendant to perform three field sobriety tests—the gaze-nystagmus, walk-and-turn, and one-leg-stand tests. The trooper testified that only two of those tests—the walk-and-turn and one-leg-stand tests—are used to determine whether a suspect is impaired by drugs.[1] The trooper modified those two tests (and the way he scored them) to accommodate defendant's physical limitations, which

_____

[1] The trooper testified that the gaze-nystagmus test does not disclose whether a person is impaired by methamphetamine or marijuana. Accordingly, although defendant did not exhibit any nystagmus, that result did not suggest, one way or the other, whether she was currently impaired by methamphetamine or marijuana.

resulted from an accident several years earlier. Specifically, he did not count defendant's inability to walk nine steps heel to toe in a straight line against her, and he permitted her to shift from one leg to another during the one-leg-stand test.

The trooper noted that, apart from defendant's physical issues, she did not follow his instructions, which was a clue that she was currently impaired. The trooper also asked defendant to perform two more tests to better assess whether she was impaired. Specifically, he asked her to touch the tip of her finger to the tip of her nose and to estimate when 30 seconds had passed. On the finger-to-nose test, defendant failed five times to touch the tip of her finger to the tip of her nose. Among other things, she touched the bridge of her nose and then searched for the tip. She touched the wrong part of her nose with the wrong part of her finger. And, at least twice, she left her finger pressed against her nose, even though the trooper had told her to immediately bring her finger down after touching her nose. Usually, most people will get the test right by the fifth attempt. Defendant, however, did not.

Defendant also did not successfully perform the last test. That test requests suspects to estimate when 30 seconds has passed. Defendant concluded that 30 seconds had passed 12 seconds too early—a result that the trooper explained indicated that she was impaired and that "her internal clock was sped up."[2]

Based on all the evidence that he had observed, the trooper suspected that defendant was driving under the influence of drugs—methamphetamine or marijuana. Even though he did not suspect that defendant had been drinking, he followed the required procedure and took her first to the police station for a breathalyzer test to determine her blood alcohol content (BAC). As expected, that test did not disclose the presence of alcohol in her system. The trooper then asked defendant to submit a urine sample to test for drugs, which prompted defendant to tell the trooper that she had used methamphetamine two days earlier.

---

[2] On cross-examination, after acknowledging that the trooper was not a medical expert, defense counsel asked whether defendant's head injury several years earlier could have affected her ability to estimate time and follow the trooper's instructions. The trooper responded, "I would think that—yeah, if the brain was still injured, then it could."

The trooper testified that a urine test will detect methamphetamine and marijuana use for at least two days after a person has used those drugs. Those drugs, however, affect a person's ability to drive for a shorter period of time, usually several hours. A blood test, by contrast, will show whether those drugs were psychoactive when the blood sample was drawn—whether they were currently affecting a suspect's driving. When asked on direct examination why he had not sought a blood sample in addition to a urine sample, the trooper answered that a blood test was more invasive. He then added, in answering the same question, "Based off of everything that I had seen, again, the totality of the circumstances, I did not believe that I needed to take her up and get blood drawn."

On cross-examination, defense counsel pressed the trooper on whether a blood test was more invasive, and the state asked the trooper on redirect about the statement he had made on direct examination—that, based on everything he had seen, he did not believe that he needed to take defendant to the hospital for a blood draw. The trooper explained, without objection, that he was "very confident" that defendant was currently impaired and that is "why [he] did not feel the need to go after [a] blood" draw. As he testified on recross-examination, under the circumstances, a blood draw would have been "overkill."

A forensic scientist testified that defendant's urine sample tested positive for methamphetamine, a byproduct of methamphetamine, and a byproduct of marijuana. According to the forensic scientist, that test result meant that defendant could have used methamphetamine and marijuana either a few days before the test or almost immediately before the trooper stopped her. The forensic scientist testified, as the trooper had, that a blood test would have shown whether either drug was psychoactive when the blood sample was taken. She explained, however, that a urine test was the statutorily preferred method for testing for drugs[3] and that the Oregon State Police Criminal Laboratory, where she

---

[3] Consistently, when defense counsel asked the trooper on cross-examination whether he had offered defendant the option of a urine or a blood test, the trooper replied: "I don't recall. I read it off the implied consent form, so I believe I would have asked for a urine test."

works, does not test blood for drugs. As she put it, Oregon "almost exclusively" tests urine rather than blood for drugs.

At the close of the evidence, defendant asked the trial court to give Uniform Criminal Jury Instruction (UCrJI) 1030 regarding less satisfactory evidence.[4] In support of that request, defendant argued that the jury reasonably could find that a blood test was objectively superior to a urine test because it would have revealed whether marijuana or meth-amphetamine was psychoactive when the blood sample was drawn. The state responded that Oregon, by statute, provides for a urine test to determine whether a driver is under the influence of drugs. *See* ORS 813.131(2) (implied consent to a urine test for intoxicants other than alcohol). The Oregon statutes permit but do not require a blood test for drugs. *See* ORS 813.150. The state reasoned that this was not a case in which the state had better evidence in its possession than it offered at trial. Rather, it was a case in which the trooper, consistently with the Oregon statutes, reasonably deter-mined that additional testing was not necessary and, for that reason, did not try to obtain a more invasive blood test.

The trial court did not give defendant's requested instruction. It explained that it was "very familiar" with that instruction and did not "think we have the evidence here that warrants" giving it. The jury found defendant guilty of DUII, and defendant has appealed the judgment of conviction. She argues that ORS 10.095 required the trial court to give her requested less-satisfactory-evidence instruction. That statute provides, in relevant part, that the jury is "to be instructed *** on all proper occasions:

"(7)   That evidence is to be estimated, not only by its intrinsic weight, but also according to the evidence which it is in the power of one side to produce and of the other to contradict; and therefore,

---

[4] UCrJI 1030 provides:

"The state has the burden to establish the guilt of the defendant beyond a reasonable doubt. When you evaluate the state's evidence, you may also con-sider the power of the state to gather and produce evidence. If the evidence offered by the state was weaker and less satisfactory than other stronger or more satisfactory evidence that the state could have offered, then you should view the weaker and less satisfactory evidence with distrust."

"(8)   That if weaker and less satisfactory evidence is offered when it appears that stronger and more satisfactory was within the power of the party, the evidence offered should be viewed with distrust."

ORS 10.095(7), (8).[5]

Defendant reasons that, on this record, the jury could find (1) that a blood test would have been "stronger and more satisfactory" evidence than the urine test that the state offered and (2) that it "was within the power of the [state]" to produce the stronger evidence at trial. It follows, she reasons, that the trial court erred.

Defendant must establish both prongs of her statutory argument to prevail. *State v. West*, 289 Or App 415, 418, 410 P3d 382 (2017). We begin with the second prong—whether it "was within the [state's] power" to produce the results of a blood test at trial.[6] On that issue, defendant argues that, because the trooper could have obtained a blood test when he stopped her, it "was within the [state's] power" to produce the results of a blood test at trial. As we understand defendant's argument, it is immaterial whether the trooper reasonably concluded, based on the available evidence, that a blood test was not necessary. All that matters, defendant contends, is whether it was possible for the

---

[5] Those statutory instructions, if given verbatim in a criminal case, could violate a defendant's constitutional rights not to testify and to have the state prove its case beyond a reasonable doubt. *See Sandstrom v. Montana*, 442 US 510, 99 S Ct 2450, 61 L Ed 2d 39 (1979) (conclusive and rebuttable presumptions directed to an element of the state's criminal case violate due process); *State v. Betts*, 235 Or 127, 135, 384 P2d 198 (1963) (commenting on a criminal defendant's constitutional right not to testify). UCrJI 1030 applies only to the state and thus avoids the constitutional problems that a verbatim statutory instruction could pose.

[6] The Oregon Supreme Court and we have identified multiple instances in which a less-satisfactory evidence instruction is not appropriate. *See, e.g.*, *Fitze v. American-Hawaiian SS. Co.*, 167 Or 439, 445, 117 P2d 825 (1941) (agreeing that a less-satisfactory-evidence instruction was not warranted because either party could have called an absent witness and the documentary evidence presented was equivalent to, if not better than, the witness's testimony); *Mooney v. Holcomb*, 15 Or 639, 16 P 716 (1888) (declining on *de novo* review to apply the presumption now codified in ORS 10.095(8) because the circumstantial evidence was equally, if not more, persuasive than direct testimony); *West*, 289 Or App at 419-20 (concluding that, on the facts in that case, documentary evidence was equivalent to video evidence). In this case, we focus on a separate issue—whether it "was within the power" of the state to offer a blood test at trial or, to use the phrase from *West*, whether that "evidence was reasonably available." *See* 289 Or App at 418 (internal quotation marks omitted).

trooper to have obtained a blood test at some point in the past.

The premise of defendant's argument is difficult to reconcile with our cases. In *State v. McNassar*, 77 Or App 215, 217-18, 712 P2d 170, *rev den*, 300 Or 704 (1986), the defendant argued that the city's decision not to equip its police cars with cameras or tape recorders deprived the jury of probative evidence that would have shown whether she was under the influence of intoxicants when she was arrested for DUII. *Id.* The defendant contended that the evidence that the state could have gathered (a video or an audio recording) was superior to the evidence that the state offered at trial (the officer's testimony), which meant that the trial court erred in not giving her requested less-satisfactory-evidence instruction. *Id.*

We reached a different conclusion. We explained that "the city's policy decision not to provide the necessary equipment [wa]s not an attempt to suppress unfavorable evidence. The state's failure *to gather* or produce this evidence did not compel the court to give the requested instruction." *Id.* at 218 (emphasis added). As we explained, the instruction is proper when a party's failure to gather or produce evidence "could give rise to an inference that the evidence would be adverse to the party—that is, when it appears that the party may be trying to hide something." *Id.* (emphasis omitted). *See also State v. Palacios-Romero*, 320 Or App 563, 567-68, 514 P3d 147, *rev den*, 370 Or 472 (2022) (following *McNassar*); *State v. Brock*, 53 Or App 785, 791, 633 P2d 805 (1981), *aff'd on other grounds*, 294 Or 15, 653 P2d 543 (1982) (holding that a less-satisfactory-evidence instruction was not required when the state reasonably declined to pursue further investigative measures that could have gathered arguably stronger corroborating evidence).

If defendant's interpretation of ORS 10.095(7) and (8) were correct, then *McNassar* should have been decided differently. There was no dispute in that case that the city could have installed cameras and tape recorders in its police cars; that is, to use defendant's textual hook, it "was within the [state's] power" to gather photographic and audio recordings. However, we held that the city reasonably made a policy decision not to do so, unrelated to any desire

to suppress adverse evidence in the defendant's case. As we read *McNassar*, a party need not conduct every possible test that could provide marginally better information or face a less-satisfactory-evidence instruction, as long as its decision not to conduct the test was reasonably based on legitimate considerations.

Ordinarily, *McNassar* would provide a complete answer to defendant's statutory argument. Defendant, however, advances two reasons why *McNassar* either should not or does not control the decision in this case. She argues primarily that the text of ORS 10.095(8), read in context, demonstrates that *McNassar* was wrongly decided and should be overruled. Alternatively, she argues that, even if *McNassar* is good law, the jury reasonably could have inferred that the trooper did not seek a blood test for an illegitimate reason—namely, to suppress potentially adverse evidence.

We begin with defendant's primary argument. She bases that argument on the legislature's use of the present passive voice "is offered," the past tense verb "was," and the word "power" rather than "possession" in ORS 10.095(8). As noted, ORS 10.095(8) provides that the jury is to be instructed on all proper occasions:

> "That if weaker and less satisfactory evidence is offered when it appears that stronger and more satisfactory [evidence] was within the power of the party, the evidence offered should be viewed with distrust."

Defendant reasons that the distinction between "is offered" and "was" in ORS 10.095(8) means that the phrase "was within the power of the party" refers to any and all evidence that the party could have gathered at some point in the past, regardless of how reasonable its decision not to gather that evidence was.[7]

Another textual interpretation is possible. ORS 10.095(8) begins with a conditional dependent clause followed immediately by a second dependent clause. It tells

---

[7] If defendant were correct, every time a doctor reasonably decided not to conduct another test that could have provided additional information, the doctor would be subject to a less-satisfactory-evidence instruction in a subsequent medical malpractice action. Defendant identifies no decision, past or present, that supports such an expansive interpretation of ORS 10.095(8).

the jury that, if weaker evidence "is offered," when stronger evidence "was within the power of the party," it should distrust the weaker evidence. In that context, the phrase "was within the power of the party" could refer simply to evidence that was available at the time of trial—*i.e.*, evidence that was either in the party's possession or within its power by virtue of a subpoena or otherwise—but withheld. *See West*, 289 Or App at 419 (evidence in the police's possession was reasonably available to the district attorney and thus was within the power of the state to offer at trial). After all, ORS 10.095(8) is an instruction that tells the jury how to evaluate the evidence that was and was not put before it. Nothing in the text of subsection (8) compels the more expansive reading that defendant urges.

Ultimately, the text of ORS 10.095(8) can be read either way. That is, it could refer to all evidence that was within the party's power to gather at some point in the past, as defendant argues, or it could refer to evidence that was available to be offered at trial but withheld. In interpreting a statute, we also consider its context. *See Stephens v. Czerniak*, 336 Or 392, 401, 84 P3d 140 (2004) ("[T]ext should not be read in isolation but must be considered in context."). Context includes the preexisting common law. *Id.*; *see Klamath Irrigation District v. United States*, 348 Or 15, 23-28, 227 P3d 1145 (2010) (looking to preexisting and contemporaneous common law decisions to determine the meaning of a 1905 Oregon statute).

ORS 10.095(7) and (8) were originally part of Oregon's Deady Code. General Laws of Oregon, Civ Code, ch IX, title IX, § 835 pp 355-56 (Deady 1845-64); *see State v. Payne*, 366 Or 588, 597, 468 P3d 445 (2020) (so stating). Those statutory instructions were a common feature of the legal landscape when Oregon adopted them. *See, e.g.*, *Clifton v. United States*, 45 US (4 How) 242, 245-48, 11 L Ed 957 (1846) (discussing a variation on ORS 10.095(8)); *Blatch v. Archer*, 98 Eng Rep 969 (1774) (discussing the maxim codified as ORS 10.095(7)); William David Evans and Robert Joseph Pothier, 2 *Treatise on the Law of Obligations, or Contracts* 116 (2d American ed 1839) (discussing what is now codified as ORS 10.095(8)).[8]

---

[8] Evans translated Pothier's treatise on contracts from its original French and added, among other things, an appendix discussing the law of evidence.

The Court's decision in *Clifton* illustrates the understanding of the nineteenth-century instruction now codified as ORS 10.095(8). In *Clifton*, the government sought to forfeit goods imported from England because the claimant had fraudulently understated the cost of those goods on invoices he submitted to customs officials. *See* 45 US at 245, 250. Under the then-applicable procedure, the government initially had to establish probable cause that the cost of the goods had been fraudulently understated. *Id.* at 244 (explaining that that issue was for the court). If the court found that the government had established probable cause, then the burden shifted to the claimant to prove to a jury that the goods had been invoiced at their actual cost. *Id.*

The evidence in *Clifton* showed that the claimant could have subpoenaed the person who had invoiced the goods to him; that is, it was "in the claimant's power to have produced evidence of the real state of [that person's] accounts and transactions with all the parties in England." *Id.* The claimant, however, did not produce that evidence at trial.[9] *Id.* The trial court accordingly instructed the jury, over the claimant's objection:

> "that the claimant knew from whom he had bought the goods, and what was their actual cost, and yet had not produced this testimony, or accounted for its absence; that to withhold testimony which it was in the power of the party to produce, in order to rebut a charge against him, where it is not supplied by other equivalent testimony, might be as fatal as positive testimony in support or confirmation of the charge. And that if the claimant had withheld testimony of his accounts and transactions with these parties (meaning the foreign houses from whom he had purchased the goods), the jury were at liberty to presume that, if produced, they would have operated unfavorably to his case."

*Id.* at 246 (parenthetical in original).

---

Evans' discussion of the law of evidence appears to have garnered as much, if not more, attention than Pothier's discussion of contracts. *See Clifton*, 45 US at 248 (quoting a discussion from "Evans' Pothier" regarding an instruction similar to the one codified as ORS 10.095(8)).

[9] Instead, the claimant offered testimony from local merchants, who estimated the value of the goods. *Clifton*, 45 US at 246.

    The Court held that the instruction correctly stated established law. *Id.* at 248. It reasoned that the presumption "exists in full force and effect against the party withholding the better evidence; especially when it appears, or has been shown, to be in his possession or power." *Id.* at 247-48. The Court's use of the word "withholding" is telling. It assumes that the evidence the claimant withheld was available to be offered at trial, either because it was in the claimant's possession or power. That is, the evidence regarding "the real state of [the claimant's] accounts and transactions with all the parties in England" was available at the time of trial and within the claimant's power because, among other things, he could have subpoenaed either the documents or the witness to testify. *See id.* at 244.

    *Clifton* does not state, as defendant argues, that the phrase "was within the power of the party" includes all evidence that a party could have but did not gather at some point in the past. Rather, the phrase describes evidence that was available to be offered at the time of trial either because it was within the party's possession or power to obtain by subpoena or otherwise. *See United States v. Reyburn*, 31 US (6 Pet) 352, 368, 8 L Ed 424 (1832) (explaining that "[t]he evidence must be attainable, or within the power of the party who is called upon to produce it").[10]

    A law review article published in 1884 contains an extensive survey of federal, state, and English cases discussing the effect of withholding evidence that was within a party's possession or power. *See* John D. Lawson, Note, *The Effect of Withholding, Suppressing, and Manufacturing Evidence in Civil Causes*, American L Rev 185 (Mar-Apr 1884). Citing cases that both precede and were contemporaneous with

_____

[10] The question in *Reyburn* involved a version of the common law best evidence rule—namely, whether secondary evidence of a commission allegedly given by a foreign government to the captain of a privateer was admissible. *See* 31 US at 364. In that context, the Court considered whether it was "within the power of the [government]" to produce the commission at trial. *See id.* at 368. The Court held that it was not because the government could not subpoena or otherwise obtain the commission and thus could not offer it at trial. *Id.* The common law version of the best evidence rule at issue in *Reyburn* and the instruction codified in ORS 10.095(8) stem from a common source. *See Clifton*, 45 US at 247-48 (explaining that the instruction at issue in that case, which is a variation on the instruction set out in ORS 10.095(8), is a derivative form of the best evidence rule); *accord* Evans and Pothier, 2 *Treatise* at 116.

the enactment of the Deady Code, the note explains that a presumption similar to the one set out in ORS 10.095(8) is appropriate when a party withholds superior evidence that was available to be offered at trial because it was within the party's possession or power. *See id.* at 186-96. The pre-existing and contemporaneous cases discussed in the note did not go further, however, and extend that presumption to instances when the party could have gathered arguably superior evidence in the past but reasonably did not do so. As the note explains, when there is no proof "that a party has withheld evidence, the non-production of better evidence, more full and definite than [the party] presents, raises no presumption against [the party]." *Id.* at 197 (citing *Schnell v. Toomer*, 56 Ga 168 (1876)).[11]

Interpreting the text of ORS 10.095(8) in context, we conclude that ORS 10.095(8) is consistent with and supports our decision in *McNassar*. Indeed, *McNassar* appears to be more favorable to defendant than the text and context of ORS 10.095(8) require. Specifically, *McNassar* left open the possibility that, even if evidence was not within a party's possession or power at the time of trial, the instruction in ORS 10.095(8) should still be given if the party could have but did not gather evidence in the past because it could have been adverse.[12] At a minimum, we cannot say that the text of ORS 10.095(8), read in context, demonstrates that

---

[11] In *Schnell*, the Georgia Supreme Court held that the trial court properly declined to give an instruction similar to ORS 10.095(8). The court explained:

"There was no evidence before the jury that the defendants held back anything in their power. The evidence they produced was not quite certain, but it did not appear that, at the time and under the circumstances, the defendants could have made the matter any more clear."

56 Ga at 171. The relevant events had happened some time earlier, and the defendants had no better evidence in their power at the time of trial. *Id.*

[12] The closest analogue historically to the qualification in *McNasser* comes from lost evidence cases. Ordinarily, if a party possessed superior documentary evidence but lost it before trial, the presumption resulting from withholding superior evidence was not appropriate. *See* Lawson, American Law Review at 188-89, 196. However, in *Attorney General v. Dean and Canons of Windsor*, 53 Eng Rep 520, 531 (1858), the court was careful to note that there was no suggestion that the Dean of Windsor had willfully destroyed a lost copy of a signed trust document, which could have provided superior proof. *McNassar*'s suggestion that the instruction set out in ORS 10.095(8) might be appropriate if a party had not gathered evidence in the past because the evidence could have been adverse may reflect a similar concern.

*McNassar* was "plainly wrong" and, for that reason, should be overruled. *See State v. Civil*, 283 Or App 395, 406, 388 P3d 1185 (2017) (stating the standard for overruling our statutory interpretation cases). Put differently, defendant's interpretation of ORS 10.095(8)—that it applies whenever a party failed to gather "superior and more satisfactory" evidence in the past—is too broad.

That leaves defendant's alternative argument. She argues that the trial court erred in not giving her requested instruction because, viewing the evidence in the light most favorable to her, the jury reasonably could have inferred that the trooper did not ask for a blood draw to avoid developing adverse evidence. Even if the jury could have drawn that inference, the trial court's ruling declining to give defendant's requested instruction will be upheld if the instruction did not correctly state the law. *See State v. Nefstad*, 309 Or 523, 542, 542 n 11, 789 P2d 1326 (1990) (applying that rule); *Hall v. The May Dept. Stores*, 292 Or 131, 134-44, 637 P2d 126 (1981) (same). As explained below, it did not.

Defendant's requested instruction would have told the jury that, in evaluating the state's evidence, it "may * * * consider the power of the state to gather and produce evidence." It then would have told the jury that, if it found that the state had offered "weaker and less satisfactory [evidence] than other stronger and more satisfactory evidence that the state could have offered, [the jury] should view the weaker and less satisfactory evidence with distrust."[13]

Defendant's requested instruction, if given, would have permitted the jury to find that the presumption stated in ORS 10.095(8) applies any time that the state could have gathered "superior and more satisfactory" evidence in the past without regard to the state's reasons for not gathering that evidence. In that respect, her requested instruction is directly at odds with our opinion in *McNassar*. We held in

---

[13] Defendant's requested instruction stated in full:

"The state has the burden to establish the guilt of the defendant beyond a reasonable doubt. When you evaluate the state's evidence, you may also consider the power of the state to gather and produce evidence. If the evidence offered by the state was weaker and less satisfactory than other stronger or more satisfactory evidence that the state could have offered, then you should view the weaker and less satisfactory evidence with distrust."

*McNassar* that the presumption in ORS 10.095(8) does not apply when the state failed to gather "superior and more satisfactory evidence" for a legitimate reason, unrelated to a desire to suppress unfavorable evidence. *See* 77 Or App at 218. For that reason alone, defendant's requested instruction was not legally correct, and the trial court did not err in declining to give it.[14]

Affirmed.

---

[14] As explained above, the jury must make two predicate findings before it can apply the presumption stated in ORS 10.095(8). It must find initially that a party has offered "weaker and less satisfactory" evidence. Additionally, it must make one of two alternative findings: (1) the party withheld "stronger and more satisfactory" evidence that was available to be offered at the time of trial because it was in the party's possession or power; or (2) if the stronger evidence was not in the party's possession or power at the time of trial, the party had not gathered or obtained the stronger evidence because it could have been adverse. In this case, no one claims that the state could have offered a blood test at trial; any evidence of drugs in defendant's blood dissipated shortly after her arrest. Only the second alternative potentially applied here, but defendant's requested instruction on that point was not legally correct. Given that conclusion, we need not decide whether her requested instruction on the first alternative was or was not legally correct.